## Phelps et al. v. Witt et al.

February 11, 1947.

Rehearing denied May 6, 1947.

Robert M. Coleman, Judge.

474

Rodes K. Myers, John B. Rodes and Leland H. Logan for appellants.

Chas. R. Bell, G. D. Milliken, and G. D. Milliken, Jr. for appellees.

OPINION OF THE COURT BY JUDGE SILER—Reversing.

Earl Phelps and others, appellants, who are residents, taxpayers and school patrons in Warren County, sought to enjoin Everett Witt and others, appellees, who are county school superintendent and county school board members in the same county, from carrying out their proposal to erect an elementary and high school building in the community of Woodburn. The chancellor having refused to grant to appellants their requested injunction, they are now before us on appeal.

Appellants' only contention on this appeal is that the evidence in this case was so powerfully persuasive in demonstrating that appellees abused their discretion in locating this school at Woodburn that the chancellor should accordingly have intervened by enjoining the appellees.

We have held in a number of these school board cases that the county boards of education have rather broad powers in shifting, changing, eliminating and locating schools. Nevertheless, we have never recognized that such boards were empowered to act arbitrarily nor beyond the pale of sound discretion in performing their functions. See Alford v. Board of Education, 298 Ky. 803, 184 S. W. 2d 207; Bell County Board of Education v. Wilson, 263 Ky. 556, 92 S. W. 2d 821; County

Board of Education of Bath County v. Goodpaster, 260 Ky. 198, 84 S. W. 2d 55.

And now having determined the general pattern of the law of this case, it is proper for us to lay upon it the woven fabric of the evidence in order to determine whether or not appellants succeeded in tailoring the garment of their cause into raiment which was appropriate, fitting and legal.

About 100 witnesses testified in this case, thereby making up 7 volumes of evidence for our consideration. This evidence indicates that the Department of Education of Kentucky made a survey in 1937 of Warren County schools and thereupon recommended, among other things, that the three, small, 12 grade schools located in Rockfield, Woodburn and Rich Pond, all in the Southern or Southwestern part of the county, be merged into one, large, new, 12 grade, school center, same to be called "The South Warren School," same to be housed in a new $100,000 building, same to be located near the crossroads at Rich Pond. The recommendations also contemplated abandonment of these three, small, 12 grade school properties as well as the abandonment of several, other, 8 grade school properties in the same general territory. The new school was expected to have a theoretical enrollment of 756 elementary pupils and 214 high school pupils and was expected to have a teaching staff of 24 persons instead of the 28 persons used for the same territory in all of the smaller schools combined. The school board did not follow the recommendations at that time, but in 1941 it began to adopt a consolidation program which placed the Rich Pond and Woodburn high schools together at Rich Pond and placed the Rich Pond and Woodburn 7th and 8th grades together at Woodburn. In 1942 the school at Rich Pond burned and the Rich Pond and Woodburn high schools, as previously consolidated, were then placed at Woodburn. Five weeks later the school at Woodburn burned and the Rich Pond and Woodburn high schools, still consolidated, were thereafter placed with the third high school of this area then located at Rockfield. And at present these three high schools, formerly located in Rich Pond, Woodburn and Rockfield, remain consolidated and remain in the Rockfield com-

munity by these fortuitous circumstances in property no doubt inadequate for all the needs of this school area.

Still later—on January 3, 1945—appellees officially adopted a proposal to erect a new, 12 grade South Warren School, same to be located at Woodburn. The initiator of this proposal was a board member who lives at the Woodburn community. The probable cost of the proposed building has been estimated at about $140,000.

Thereafter, on January 9, 1945, appellants, who appear to be residents in or near the other communities affected, began this litigation seeking to enjoin appellees from placing the new building at Woodburn.

On September 21, 1945, the State Board of Education adopted a regulation providing a method of giving official approval generally to new public school projects here in our state. This regulation contemplates, in cases of proposed new schools, an approval by the State Superintendent of Public Instruction, not only for building plans, but also for sites, for community locations, for desirability in general. This regulation of September 21, 1945, was adopted by the proper state school authority pursuant to the provisions of KRS 156.160, which provisions enable the State Board of Education to adopt "regulations deemed necessary or advisable for the protection of the physical welfare and safety of the public school children."

Early in 1946, in spite of the then pendency of this undecided litigation, in spite of the state board's then prevailing regulation pertaining to the state superintendent's approval of sites and of communities for new school buildings, in spite of the survey of 1937 advising that the new South Warren School be located near the cross-roads at Rich Pond, the appellees went ahead and bought a site at Woodburn for $3000 for the proposed new building.

The state superintendent had not been given an opportunity to pass judgment on the new site or on the new community location or on the proposed plans. Yet he and his departmental advisors are experts. Yet he and his departmental advisors are endowed with an experience as broad as, or even broader than, the whole state. We recognize that the state superintendent's ap-

proval would be, in final analysis, only advisory in nature. Nevertheless, we think he should have had the opportunity to advise with the appellees in a matter so vital as that of a new school to cost $140,000, to last possibly through another generation, to serve as a training center for the farmers, teachers, preachers, doctors and operators of tomorrow's life. These county school board members were and are fellow state officers with the state superintendent. See Ward v. Siler, 272 Ky. 424, 114 S. W. 2d 516, and cases cited therein. They were not only fellow state officers, but they were and are interested, along with the state officials, in the same program, the program of furthering public school education. As we said before, we recognize that the state superintendent's approval would only be advisory in nature, and yet, in a case of this kind, we can conceive of it as possibly being a controlling factor, all things else being equal. His opinion might represent the balance of persuasive power necessary to tip the scale either for or against a proposal of this kind, in an instance where interested patrons disagree and where difficulty of determination dogs all efforts of final decision within proper discretion.

In the instant case, there are potent arguments against locating the new South Warren School at Woodburn. There are, on the other hand, some good arguments favoring Woodburn. We now summarize what we believe to be all arguments on both sides.

### Arguments Opposing Woodburn.

(A) It is not near the geographic center or the population center of the area in question. Woodburn is about 1½ miles from the Warren County line and it appears to be about 20 miles, over usual routes, from some of the homes of this general school area.

(B) It is in a general locality affected by high water conditions in times of unusual rainfall.

(C) It has not had the benefit of any formal consideration by the state superintendent as a proper and desirable location for this proposed new school.

### Arguments Favoring Woodburn.

(A) It is the largest community in the area and

therefore has more of the usual community advantages of a larger town.

(B) Its citizens have subscribed for a fund of $2735 to be used to landscape, improve and beautify the grounds of the proposed school.

(C) It has more pupils living in walking distance of the proposed new school than there are in any other locality of the area.

(D) The chancellor, familiar with this county and this school area, has rendered a judgment which, in it's effect, favors Woodburn.

Did appellees abuse their discretion? That is the question before us on this appeal.

It appears that it would never be possible to find an abuse of discretion in the instance of an official decision standing upon the solid rock of sound reason. But only where a decision quivers upon the quicksand of caprice or wavers upon the waters of mere whim can there be found that enemy to public welfare named "abused discretion." It has been well said that "he who will not reason is a bigot; he who cannot is a fool; and he who dares not is a slave." We are certain that appellees are not bigots nor fools nor slaves. But we do believe that they should have reasoned to the extent of at least ascertaining the able yet free advice of the state superintendent upon this very vital public problem which they were called upon to solve. In a famous poem we find this verse:

"You know, my friends, with what a brave carouse
I made a second marriage in my house;
Divorced old barren reason from my bed,
And took the daughter of the vine to spouse."

It is never advisable for public servants to divorce old reliable reason and to marry that daughter of the vine we would call "whim" in a case of this kind. However, we might not feel too strongly inclined to say that appellees divorced reason and married whim in this case, except for the fact that they did not follow the state board's regulations, not even to the extent of saying, "what do you think about this important question of great public interest."

One of the tests of whether or not an official, or a set of officials, has abused discretion lies in a determination of whether or not the pertinent law has been closely followed. See Vol. 12, Words and Phrases, Perm. Ed., page 588. If appellees did not submit their proposed plans, site, and community selection to the state superintendent for his approval, or, at least, for his advice, we do not see how it can be logically contended that they have closely followed the law or more specifically the regulations provided under the law and set up for the particular benefit of all of our public school systems of this Commonwealth.

It is an undoubted and self-evident truth to say that the very foundation of every state is the education of its youth and that a state's schoolhouses are the republican line of its fortifications. The public schoolhouse of a people should always symbolize a *summum bonum* for those people through its broad possibilities of rendering the greatest good to the greatest number. But it is very difficult to visualize a *summum bonum* in the form of a schoolhouse located out on the very hem of the people's territorial vesture. Therefore, the most advantageous location of a permanent, 12 grade schoolhouse is a thing of public and general interest in a county. It represents a power placed in the hands of public servants similar to the trust we invest in those charged with some accomplishment of our future destiny. It should surely never be abused. In view of all the facts and circumstances of this case and especially because appellees have not followed the regulations of the State Board of Education, have not sought the approval of the State Superintendent of Public Instruction, have not consulted with the latter official on this important question of public welfare, we consider it necessary to now reverse the judgment of the chancellor with directions to enter a judgment permanently enjoining appellees from locating the South Warren School in this community of Woodburn, which, among other considerations, seems rather remote from the center of this school area and from the greater number of its people in interest.

Judgment reversed.