## Bell et al. v. Board Of Education Of Shelby County.

December 17, 1948.

William H. Hays, John M. Berry and Bernard B. Davis for appellant.

William H. Crutcher, Jr. for appellee.

OPINION OF THE COURT BY CLAY, COMMISSIONER— Reversing.

The Board of Education of Shelby County (hereinafter referred to as "Board") is proposing the erection of a new high school building near Shelbyville and the issuance of revenue bonds in the amount of $650,000, as authorized under KRS 162.120 to 162.300, in order to finance the project. Appellants, citizens and taxpayers of Shelby County, brought suit against the Board to enjoin such action. Subsequently the Board filed a mandamus suit against the Shelby County Fiscal Court to require it to carry out the plan by the adoption of proper resolutions and orders. These two suits are consolidated, and a single issue is common to both. The question is whether or not the Board has proceeded properly in undertaking this particular consolidated high school program. The Chancellor decided in favor of the Board.

The governing principle of law is accepted by both parties: that is, a court of equity may enjoin the Board where the facts show its actions are arbitrary and constitute an abuse of its broad discretionary powers. See Bell County Board of Education et al. v. Wilson et al., 263 Ky. 556, 92 S. W. 2d 821; Weaks v. Board of Educa-

tion, Graves County et al., 282 Ky. 241, 137 S. W. 2d 1094; and Phelps et al. v. Witt et al., 304 Ky. 473, 201 S. W. 2d 4.

The Board is confronted with a serious problem in Shelby County. It operates eight high schools. Because four or five of these do not have the minimum of sixty pupils required by the State Department of Education, they are threatened with the loss of an accredited rating. They are now accredited on an emergency basis pending action by the Board to effect some plan of consolidation.

The Board had its entire school system studied by Griffenhagen and Associates, a well recognized organization specializing in such work. Its report recommended the construction of a central high school building such as now proposed. This organization also recommended the consolidation of the county school district with the Shelbyville independent school district, which unquestionably would be an ultimate desirable goal, but no steps appear to have been taken along this line.

Plans were laid by the Board to construct the new central high school building about one mile west of the Shelbyville Courthouse on U. S. Highway 60. The estimated cost of this building is $650,000, to be financed by the issue of revenue bonds in that amount. Apparently the Board will be able to have these bonds underwritten by a reputable bond broker. The principal controversy, however, concerns the liquidation of this indebtedness.

Evidence disclosed the following financial situation of the Board: It ended the fiscal year 1947-48 with a net deficit of something over $13,000.00. It is estimated that by increasing the ad valorem tax rate to the legal maximum of $1.50 per $100 of property valuation (KRS 160.475), the Board will have for a typical year a net surplus slightly in excess of $46,000. There will be needed an average of $45,000 per year for twenty years to pay interest and retire the bonds issued for this new capital outlay. In addition, it is estimated the operation of the new central high school will require the expenditure of an additional $20,000 per year. The above figures indicate the new project will cost $65,000 a year, and the new tax rate will bring a net increase in revenue of approximately $46,000.

To obviate this apparent annual deficit of $19,000, the Shelby County School Superintendent estimated the Board would realize an additional surplus of about $25,000 each year from savings on items of expenditure in the fiscal year 1948-49 which are "not typical and may not be expected to recur in any future year." The items going to make up this estimate include such things as new grounds, new buildings, new furniture, improvements, busses, and an anticipated $5,000 per year profit to be realized from athletics, plays and movies held in or about the proposed new school building.

If this $25,000 surplus calculation is dependable, the proof indicates a potential yearly net surplus of about $6,500 after paying the interest and retiring the bonds in liquidation of the proposed new capital venture. Appellants have taken the figures shown by the evidence (omitting the $25,000 item above mentioned) and attempt to prove that, assuming the typical year's figures to remain constant, by the time the bond issue is amortized over twenty years the Board would have an aggregate deficit of over $300,000. Appellants insist that this is a very conservative estimation because of a number of factors which demonstrate operating expenditures will be greater and income less in the coming years.

The Board refuses to recognize the validity of appellants' calculations, and maintains the future revenues and expenditures cannot be determined with any degree of certainty. However, it has failed to project any analysis to prove the financial possibilities are much more than a hope the plan will work out on a sound basis.

The Board's estimated savings of approximately $25,000 a year based on supposedly non-typical expenditures is highly speculative. This is particularly so with respect to the item of $5,000 for prospective profits to be realized from the new school building. Also included in this estimate as a non-recurring expense is an item of $6,000 for school busses, apparently spent, or to be spent, in the fiscal year 1948-49. The Griffenhagen report shows that the present condition of busses now being operated is far from satisfactory, and there is proof the new transportation needs will require the purchase of at least six additional busses, which will cost in the neighborhood of $20,000. Other items in this estimate indicate a re-

trenchment by the Board in the improvement and maintenance of its present school plant. A careful review of the figures available makes it appear very doubtful the Board will develop more than a temporary surplus for one or two years, which will rapidly be converted into a mounting deficit.

It is difficult for us to determine in what manner the Board can reasonably expect to take care of this large capital outlay. The tax rate is now at its top limit, so no increased revenue could be realized by changing this rate. The property in Shelby County has been recently subjected to a blanket assssment increase, and there is no indication that a further increase along this line will be made.

There is no trustworthy evidence the Board may be able to reduce its operating expenditures. The Griffenhagen report shows the physical condition of the present school plant is such that the costs of maintenance will increase rather than be reduced. There is other persuasive proof to the effect the Board will be unable to minimize its costs without seriously impairing the present school facilities.

It is significant the proposed new building will be designed for and will accommodate only one-fifth of the school pupils in the county. It is also significant that this single new building will cost more than the value of the entire school plant now in existence. There are other objections to the proposed building which relate to its site and transportation problems. These latter matters are not sufficient by themselves to indicate an abuse of discretion on the part of the Board, but coupled with the financial problem, they do demonstrate this entire plan was not given the careful consideration such a sizable project should command.

One more fact should be pointed out. The Board made no study looking toward the possibility of consolidating two or three high schools to take care of the problem with which it was confronted. Apparently only this one plan was taken under advisement.

Appellees rely upon the case of Fyfe et al. v. Hardin County Board of Education, 305 Ky. 589, 205 S. W. 2d 165, which they suggest is conclusive of the question we have before us. An examination of this case shows

the question presented here was not there involved or considered.

In view of all the facts, we have concluded the Board does not have an adequate source of revenue to finance this undertaking; that to do so might well lead to the bankruptcy of the project; and that it would imperil the entire school system of the County. We of course are very favorably inclined toward the improvement of school facilities, and, like the Board we would be glad to see a fine new high school in Shelby County, and in all the counties of the state where needed for that matter. The evidence is convincing, however, that the Board in this instance proposes an expensive undertaking which is not shown to be financially sound. The Court must intervene to protect the citizens and taxpayers and the school system as a whole where it plainly appears that the action proposed is not justifiable. In our opinion the Board abused its discretion and should not be permitted to go forward with this particular plan.

There is an added reason why the judgment of the lower Court should be reversed. The record fails to show the necessarily involved financial plan for the erection of the new school building was submitted to the State Board of Education for its consideration and approval. It is true the county superintendent made certain estimates relative to the financing of the Shelby County School District program for the future, and Mr. Chilton, of the State Department of Education, had before him the county superintendent's figures when he gave his deposition in the case. However, the new financial program was not submitted to, nor approved by the State Board.

KRS 156.070 provides: "(1) The State Board of Education shall have the management and control of the common schools, public higher education for Negroes, public vocational education and vocational rehabilitation, and the Kentucky School for the Blind." The legislature could not have used broader language in investing complete control over the common school system in the State Board of Education. KRS 160.470 deals with the budgets of all school districts and requires their approval by the State Board of Education. This section sets forth in detail what the budget shall contain. Pro-

854

vision is made for a working or detailed budget if required by the State Board of Education. The budget must show "the amount of money needed for current expenses, debt service, capital outlay, and other necessary expenses of the schools during the succeeding fiscal year." It is expressly provided in KRS 160.550 that no school budget may be exceeded except under certain stated conditions.

Under KRS 162.160, when any board of education desires to erect a school building under a leasing plan, "the plans and specifications shall give a full description of the building to be constructed, the details thereof and the manner of construction. The plans and specifications shall be prepared by an architect selected by the city (county) and approved by the board of education of the school district, and shall be submitted to the board of education of the school district and to the Superintendent of Public Instruction for approval." This step was taken in the case before us, insofar as the actual architectural plans were concerned.

It goes without saying that any school building program for a school district would necessarily involve financial as well as architectural plans. We have noted above the specific requirements of the statute relative to the manner in which school funds must be handled. Aside from certain capital outlay expenditures, all of the statutes relating to school financing contemplate that school districts shall operate on a cash basis from year to year.

In the case at bar not only is a major capital outlay program contemplated under the lease plan, but also there is involved a substantial increase in the levy for school purposes. Certainly any such program would require, as contemplated by the statutes, supervision on the part of the State Board of Education. It was just as necessary for the local Board to submit to the State Board the revised financial program, in the form of an amended or supplemental budget, for consideration and approval as it was to submit architectural plans for the construction of the proposed high school building. From what has been said, it appears the Board not only abused its discretion but failed to obtain the required approval of the proper authorities.

This decision and opinion shall have prospective effect only and shall not be construed as impairing the validity of revenue bonds heretofore issued for school purposes without the approval of the State Board of Education.

For the reasons stated, the judgment is reversed for the entry of proper orders consistent with this opinion.