Mitchell WILLIAMS, Individually; Mary E. Williams, Individually; and Mitchell Williams, Administrator of the Estate of Anthony Wayne Williams, Appellants,

v.

KENTUCKY DEPARTMENT OF EDUCATION; Board of Claims; and Commonwealth of Kentucky, Appellees.

No. 2000–SC–0342–DG.

Supreme Court of Kentucky.

Aug. 21, 2003.

As Modified Sept. 23, 2003.

Lawrence R. Webster, Pikeville, Counsel for Appellants.

A.B. Chandler, III, Attorney General, D. Brent Irvin, Assistant Attorney General, Civil & Environmental Law Division, Office of the Attorney General, Frankfort, Counsel for Appellees.

Opinion of the Court by Justice COOPER.

At approximately 10:15 a.m. on Friday, April 28, 1989, Anthony Wayne Williams was killed in an automobile accident in Floyd County, Kentucky. At the time of his death, Williams was sixteen years of age and a member of the junior class at Betsy Layne High School. School was in session and Williams should have been at a school-sponsored extracurricular activity, *i.e.*, decorating the school gymnasium in preparation for the junior-senior prom. Instead, he was riding as a passenger in an automobile operated by another student, Julie Hall. Both Hall and Williams had already consumed an undetermined quantity of alcoholic beverages and were on their way to a liquor store to purchase more. The accident occurred when Hall lost control of the vehicle, causing it to leave the roadway and overturn. Williams, who was not wearing a seat belt, was ejected from the vehicle and crushed to death when the vehicle rolled on top of him. The administrator of Williams's estate brought this wrongful death action in the Board of Claims alleging that negligent supervision of the extracurricular activity by the high school faculty was a substantial factor in causing his death. His parents also brought separate actions for loss of consortium. All three claims were asserted against the Commonwealth of Kentucky's Department of Education (DOE).

After hearing the evidence, the Board of Claims dismissed all three claims, holding that the duty to prevent harm by providing reasonable supervision is a regulatory function, the negligent performance of which does not give rise to a cause of action. On appeal, the Floyd Circuit Court affirmed, concluding that (1) the Board's decision was supported by substantial evidence, CR 52.01; (2) the claims

asserted by Appellants were not claims for which relief could be granted, CR 12.02(f); and (3) Appellants had not proven "the essential elements of negligence." On further appeal, the Court of Appeals concluded that the DOE is not vicariously liable for the negligence of employees of a local board of education because "it is a separate entity from the local board." We affirm the dismissal of the claims for loss of consortium but reverse the dismissal of the claim for wrongful death. Because the Board of Claims dismissed that claim without reaching the issues of negligence, causation, apportionment, or damages, we remand to the Board for further proceedings on those issues.

## I. NEGLIGENT SUPERVISION.

 It is well established in this jurisdiction that a school teacher can be held liable for injuries caused by negligent supervision of his/her students. *Yanero v. Davis*, Ky., 65 S.W.3d 510, 529 (2001); *Wesley v. Page*, Ky., 514 S.W.2d 697, 699 (1974) ("The very adventuresome nature of teenagers leads to experimentation and should place a teacher on notice that he can look forward not only to the expected but also to the unexpected."). The basic premise for this duty is that a child is compelled to attend school[1] so that "the protective custody of teachers is mandatorily substituted for that of the parent." *Yanero, supra*, at 529 (*quoting McLeod v. Grant County Sch. Dist. No. 128*, 42 Wash.2d 316, 255 P.2d 360, 362 (1953)). The "special relationship" thus formed between a school district and its students imposes an affirmative duty on the district, its faculty, and its administrators to take all reasonable steps to prevent foreseeable harm to its students. *Leger v. Stockton*

*Unified Sch. Dist.*, 202 Cal.App.3d 1448, 249 Cal.Rptr. 688, 693–94 (1988); *Doe Parents No. 1 v. State, Dep't of Educ.*, 100 Hawai'i 34, 58 P.3d 545, 590–92 (2002); *Eversole v. Wasson*, 80 Ill.App.3d 94, 35 Ill.Dec. 296, 398 N.E.2d 1246, 1247 (1980); *McLeod, supra*, at 362–63; *cf. Lane v. Commonwealth*, Ky., 956 S.W.2d 874, 876–82 (1997) (Cooper, J., concurring). *See also* Restatement (Second) of Torts § 314A(4) (1965) ("One who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection is under a similar duty [to protect the other against unreasonable risk of physical harm].”), cmt. d ("The duty to protect the other against unreasonable risk of harm extends to risks arising out of the actor's own conduct."), § 320, cmt. b ("The circumstances under which the custody of another is taken and maintained may be such as to deprive him of ... the protection of someone who, if present, would be under a duty to protect him, or though under no such duty would be likely to do so.... So, too, a child while in school is deprived of the protection of his parents or guardian. Therefore, the actor who takes custody of a ... child is properly required to give him the protection which the custody or the manner in which it is taken has deprived him.").

 The "findings of fact" of the Board of Claims's administrative law judge (ALJ) largely consists of a summary of the testimony of the various witnesses who appeared at the hearing. The testimony was in many respects contradictory and the ALJ did not specify which testimony he believed to be accurate and which he believed to be inaccurate. Thus, for purposes of determining whether the evidence

1. Although Anthony Williams was sixteen years of age at the time of his death, he had not complied with KRS 159.010(2), thus his attendance was mandatory under KRS 159.010(1).

was sufficient to have sustained findings of negligence and causation, we assume as accurate the facts most favorable to Appellants.

▮ The junior-senior prom was scheduled for Saturday night, April 29, 1989. By tradition, the junior class was charged with decorating the gymnasium for the prom on the immediately preceding school day while the senior class enjoyed a "skip day," an unauthorized but unpunished absence from school. Apparently, the seniors would report to school so as to be recorded as in attendance then depart without authorization to engage in less scholarly pursuits. In 1989, the junior class sponsors, Mr. Stratton, Mrs. Fraley, and Mrs. Jones, determined that two days would be needed to complete the prom decorations and that, to minimize classroom absences, those junior class members with last names beginning with the letters A—M would decorate on Thursday, April 27th, and those with last names beginning with the letters N—Z would decorate on Friday, April 28th. Under this arrangement, there would be approximately 100 students at the gymnasium each day.[2]

The gymnasium was located on the elementary school campus approximately two miles from the high school. The original plan was for the decorators to travel from the high school to the gymnasium in private vehicles owned and operated by students. Each member of the junior class was given a "permission slip" to be signed by that student's parent authorizing this proposed method of transportation. Neither of Anthony Williams's parents signed the permission slip. Anthony was not permitted to drive his own vehicle to school and did not do so on April 28, 1989. On Wednesday afternoon, April 26th, Mrs.

Jones expressed concern about the possible danger posed by a large number of students transporting themselves by private vehicles to and from an extracurricular activity during school hours. The principal, Mr. Bentley, agreed that a school bus should be used for transportation, thus eliminating the need for a "permission slip." On Thursday morning, Mr. Bentley made an announcement over the school's intercom system that transportation to the gymnasium would be only by bus. Mrs. Jones was designated to see that the students got on the bus. Although she made a list of those who rode the bus and sent the list with a student to Mrs. Fraley at the gymnasium, she was unable to recall how many students were actually on the bus except that, "I can't say that it was full." There was substantial evidence that most of the students traveled to the gymnasium in private vehicles. In fact, no one recalled seeing a school bus on Friday, the day Anthony Williams was killed. Nor were the students required to remain at the gymnasium after their arrival but came and went as they pleased. A teacher at the elementary school located adjacent to the gymnasium testified that there were vehicles coming and going all the time and that he did not see any teacher or principal attempting to stop the students from leaving the school property. Many of those who came to the gymnasium on Friday were not authorized to be there, including Julie Hall who was scheduled to decorate only on Thursday because her last name did not begin with the letters N—Z.

Many of the students brought alcoholic beverages to the gymnasium in their private vehicles and openly consumed those beverages while supposedly decorating the gym. A former student testified that he

---

**2.** Another consequence of this arrangement was that senior class members enjoyed two "skip days."

consumed a "fifth" of whiskey on the premises that day and that he carried whiskey around in an open container inside the gym without question from Mr. Stratton or Mrs. Fraley. A student testified that there was an odor of alcohol inside the gym and that she saw students huddled together, drinking alcohol, in the parking lot. The elementary school teacher testified that the parking lot was strewn with empty alcoholic beverage containers. As the morning wore on, only ten to fifteen students actually remained inside the gymnasium. Mrs. Fraley, who had brought her four-year-old daughter to the event, and Mr. Stratton, who explained that he was working on a carousel and paying little attention to what was going on elsewhere, both claimed not to have noticed the presence of alcoholic beverages or the absence of the majority of their students.

On the same morning that Anthony Williams was killed, a member of the senior class who had reported to school before "skipping," was arrested while consuming alcoholic beverages at Jenny Wiley State Park. Instead of being taken to a juvenile detention center, he was returned to the high school. He testified that upon arriving at the school, he observed that only about 100 of the 800 students enrolled were actually in attendance and that Mr. Bentley was having difficulty keeping those students in their classrooms. Shortly thereafter, the former arrestee again "skipped," leaving school for the second time that day.

From this evidence, an ALJ could conclude that the faculty and staff of Betsy Layne High School should have been aware that their students were drinking and driving while traveling to and from a school-sponsored and supervised extracurricular activity occurring on school property during school hours. The obvious danger to the students from that fact should have been foreseen (and probably was, in view of the earlier decision to permit transportation only by bus), thus triggering the affirmative duty to take all reasonable steps to prevent harm to the students. Those steps could have included enforcement of the requirement that travel to the gymnasium be only by bus, confiscation of alcoholic beverages, requiring those authorized to participate in the decorating project to either participate or return to class, and enforcement of classroom attendance by those not authorized to participate (including Julie Hall). An ALJ could believe that the described pandemonium at Betsy Layne High School and at the gymnasium on the morning of April 28, 1989, was the result of negligent supervision (or no supervision), and that such was a substantial factor in causing the death of Anthony Williams.

 We disagree with the Board of Claims' conclusion that a teacher's duty to supervise students is a "regulatory" (discretionary?) function. Promulgation of rules is a discretionary function; enforcement of those rules is a ministerial function. *Yanero*, 65 S.W.3d at 529. *See also* KRS 161.180(1):

Each teacher and administrator in the public schools shall in accordance with the rules, regulations and bylaws of the board of education made and adopted pursuant to KRS 160.290 for the conduct of pupils, hold pupils to strict account for their conduct on school premises, on the way to and from school, and on school sponsored trips and activities.

Pursuant to KRS 160.290, the Floyd County Board of Education had adopted a Code of Conduct that identified, *inter alia*, the following behavior violations that would subject a student to disciplinary action: non-attendance of class; leaving school grounds without permission; and use or possession of alcohol at any time

"during the entire school day, to and from school, on school buses, and all school sponsored activities." Another section of the Code of Conduct charged teachers with the responsibility to "enforce rules and regulations of the Board of Education." Compliance with this directive was a ministerial, not a discretionary or regulatory, function.

 Nor can the actions of Julie Hall and Anthony Williams be viewed as superseding causes of Williams's death. "[I]f the resultant injury is reasonably foreseeable from the view of the original actor, then the other factors causing to bring about the injury are not a superseding cause." *NKC Hosps., Inc. v. Anthony,* Ky.App., 849 S.W.2d 564, 568 (1993) (citing William L. Prosser, *Law of Torts* 272 (4th ed.1978) and *Deutsch v. Shein,* Ky., 597 S.W.2d 141, 144 (1980)). The basic premise of a superseding cause is that it is "extraordinary and unforeseeable." *House v. Kellerman,* Ky., 519 S.W.2d 380, 383 (1974); *see also Britton v. Wooten,* Ky., 817 S.W.2d 443, 451 (1991). In *Watts By and Through Watts v. K, S & H,* Ky., 957 S.W.2d 233 (1997), we held that a dram shop owner who sold alcoholic beverages to a minor passenger in an automobile occupied by other minors should have reasonably foreseen that the purchaser would share those beverages with other passengers, including the driver, and that consumption of those beverages would result in an accident. *Id.* at 239. Likewise, the faculty members in charge of this school-sponsored event conducted during school hours and on school premises should have foreseen that students who consumed alcoholic beverages on the premises, then left the premises in their private vehicles during the event, with or without permission, were likely to be involved in an accident causing injury or death. Thus, the fact that an alcohol-related accident actually occurred and caused the death of one of the students was neither "extraordinary" nor "unforeseeable." *House v. Kellerman, supra,* at 383.

## II. VICARIOUS LIABILITY.

 Under common law principles of agency, a principal is vicariously liable for damages caused by torts of commission or omission of an agent or subagent, other than an independent contractor, acting on behalf of and pursuant to the authority of the principal. *Wolford v. Scott Nickels Bus Co.,* Ky., 257 S.W.2d 594, 595 (1953); *Capurso v. Johnson,* Ky., 248 S.W.2d 908, 910 (1952) (subagent is an agent of the principal and "is directly responsible to the principal for his conduct"); *Johnson v. Bryan,* 40 Ky. (1 B.Mon.) 292, 293 (1841) ("The master or principal is liable for injuries occasioned by the *negligence* or *unskillfulness* of his servant, agent, or subagent, whilst in the *course* of his *employ* and in the *discharge* of his *business,* 'though the act may be obviously tortuous:' 1st *Chitty,* 92–3; 1st *Black. Com.* 431.") (emphasis in original)); Restatement (Second) of Agency § 5 cmt. f (1958) ("subservant committing a tort in the scope of employment subjects both his employer and the latter's master to liability"). And when the principal is under a duty to provide protection for or to have care used to protect others and confides the performance of that duty to a servant or other person who causes harm to them by failing to perform that duty, vicarious liability attaches even if the agent or subagent is not a servant, *i.e.,* is an independent contractor. Restatement (Second) of Agency, *supra,* §§ 251(a), 255; *e.g., Sharp v. W.H. Moore, Inc.,* 118 Idaho 297, 796 P.2d 506, 512 (1990) (owner of secured building vicariously liable to tenant injured by rapist who was able to enter building because subagent of security service contractor hired by owner failed to lock the door).

There may be a series of subagents. Restatement (Second) of Agency, *supra*, § 5 cmt. e.

The DOE claims and the Court of Appeals held that local boards of education are not agents of the DOE but are separate and distinct agencies of the Commonwealth assigned to perform separate and distinct functions, *i.e.*, they are co-agents; and, thus, the DOE is not vicariously liable for the failures of employees of local boards to perform their ministerial duties. *See* Restatement (Third) of Agency § 1.01 cmt. c, illus. 14, § 1.04(1), (10), cmts. a, i, j (Tentative Draft No. 2, 2001), and § 3.14 cmt. e (Tentative Draft No. 3, 2002). This assertion acquires some support from the fact that both agencies were created by the same principal, *i.e.*, the General Assembly. Restatement (Third) of Agency, § 1.04(1), *supra*. Of course, the relationship between the DOE and a local board of education is not one of common-law agency created by the agreement and consent of private persons or business entities but is a statutory relationship devised by the General Assembly to ensure the accomplishment of its constitutional duty to provide for an efficient system of common schools. Ky. Const. § 183. Thus, the nature of that relationship depends on the legislative intent deducible from the statutory scheme. Because the events giving rise to these claims occurred on April 28, 1989, our analysis is confined to the statutory and regulatory scheme in effect on that date; thus, all references to and quotations from statutes and regulations are to and from the 1989 versions of those statutes and regulations. We note, however, that while substantial changes have been made in the statutes and regulations pertaining to education upon and after the enactment of the Kentucky Education Reform Act (KERA), 1990 Ky. Acts, ch. 476, those changes have not diminished the authority of the appropriate executive branch agencies to control and direct the activities of local boards of education.

In *Rose v. Council for Better Education, Inc.*, Ky., 790 S.W.2d 186 (1989), we identified "where the buck stops"[3] in the context of public education.

> As we have previously emphasized, the *sole responsibility* for providing the system of common schools lies with the General Assembly. If they choose to delegate any of this duty to institutions such as the local boards of education, the General Assembly must provide a mechanism to assure that the ultimate control remains with the General Assembly, and assure that those local school districts also exercise the delegated duties in an efficient manner.

*Id.* at 216 (emphasis in original). This, of course, was not a novel notion. "[P]ublic education has long been recognized as a function of State government," *Bd. of Educ. of Louisville v. Society of Alumni of Louisville Male High School, Inc.*, Ky., 239 S.W.2d 931, 933 (1951), and "every common school in the state ... is a state institution." *City of Louisville v. Bd. of Educ. of City of Louisville*, 154 Ky. 316, 157 S.W. 379, 380 (1913).

As of 1989, the General Assembly had delegated its supervisory responsibility over the common schools to the Department of Education which, at that time, consisted of "the superintendent of public instruction who shall be the chief executive

---

**3.** Harry S Truman, thirty-third president of the United States, kept a sign on his White House office desk that read, "The Buck Stops Here," which was derived from the slang expression "pass the buck" meaning to pass responsibility to someone else. *A Dictionary of Americanisms on Historical Principles* 198–99 (Mitford M. Mathews ed., Univ. of Chicago Press, 1951).

officer of the department, the organizational structure of the department as set forth in this section, the state board for elementary and secondary education, and the state board for vocational-technical, adult education and vocational rehabilitation services." KRS 156.010(1). The "management and control of the common schools and all programs operated in such schools" was vested in the state board for elementary and secondary education, an arm of the DOE. KRS 156.070(1). "The legislature could not have used broader language in investing complete control over the common school system in the State Board of Education." *Bell v. Bd. of Educ. of Shelby County,* 308 Ky., 848, 215 S.W.2d 1007, 1010 (1948). One function of the board of elementary and secondary education was to adopt administrative regulations with respect to "planning, coordinating, *administering, supervising, operating* and evaluating the educational programs, services and activities" within the DOE. KRS 156.031(6) (emphasis added). The General Assembly, itself, defined what misconduct would result in suspension or expulsion of a student, including "willful disobedience" (interpreted by the Attorney General to include unexcused absence from school, OAG 74–312) and "use or possession of alcohol or drugs ... on school property, as well as off school property at school sponsored activities." KRS 158.150. Another statute specifically charged the DOE with developing statewide student discipline guidelines. KRS 158.148(1). Local boards had the authority to make and adopt rules for the conduct of students, but only insofar as "consistent with the general school laws of the state." KRS 160.290(2); *cf. Dorsey v. Bale,* Ky., 521 S.W.2d 76, 78 (1975) (local school board was without authority to adopt disciplinary rules other than as authorized by KRS 158.150).

Local boards of education were required to operate their schools "consistent with the rules and regulations of the state board for elementary and secondary education," KRS 160.290(1), and to "prepare and submit to the state board for elementary and secondary education reports on all phases of its school service," KRS 160.340(1), including its policies relating to, *inter alia,* the transportation, discipline, and conduct of its pupils, KRS 160.340(2)(a), (b). Contrary to its present assertion, the DOE, by and through the board of elementary and secondary education, and as authorized by KRS 158.060 and 158.070, substantially micromanaged the daily activities of local schools. KRS 158.060 established the six-hour instructional day and 702 KAR 7:010(5) specified how those six hours could be spent:

Section 5. (1) Each school day shall consist of at least six (6) hours of actual organized and supervised instruction, exclusive of lunch periods and recesses, except that kindergarten, readiness classes, first grade classes, and classes for the handicapped may be a program of less than six (6) hours per day under policies adopted by the local school board *and approved by the State Board of Education.* Lack of compliance with minimum school day requirements shall, pursuant to KRS 157.350, result in appropriate proportional reductions in Foundation Program allotments.

(2) The following are the *only approvable activities* that may be conducted during the six (6) hour school day:

(a) Courses and activities included in the "Program of Studies for Kentucky Schools, Grades K–12;"

(b) Enrichment courses approved by the State Board of Education;

(c) Experimental courses or programs approved by the State Board of Education;

(d) *Cocurricular activities, such as club meetings and assemblies, as long as such are related directly to the instructional program and are scheduled so as to minimize absences from classroom instruction;* and

(e) Homeroom in the morning and afternoon for checking attendance. These periods shall not exceed ten (10) minutes per homeroom or twenty (20) minutes daily.

(Emphasis added.) KRS 158.070 and 702 KAR 7:020 enumerated those days on which school could be closed, *e.g.*, four holidays "to be selected from those listed in KRS 2.110, 18.350 and 158.070," two in-service days, two KEA meeting days, etc. There was no authorization for "skip days" or "decorating days." Nor were these mentioned in the student handbook published by the Floyd County Board of Education (presumably because nonattendance in classes on days other than those authorized by the DOE by and through the state board of elementary and secondary education would have reduced its Foundation Program allotments).

▮▮ From the language and structure of this statutory scheme, we conclude that the legislative intent was to vest the overall management, operation, and control of the common schools in the DOE, with the local boards of education functioning as agents of the DOE created for the purpose of implementing the DOE's policies and directives at the local level. If the local board failed to implement those policies and directives, or did so in an insufficient or negligent manner, the DOE was still responsible (as was the General Assembly where the "buck" ultimately stopped). Thus viewed, the statutory relationship between the DOE and the local board was more akin to that of principal-agent than to that of co-agents. Of course, this analysis was rendered necessary only because Appellants named the DOE, instead of the Commonwealth, as the only party defendant. Obviously, the employees of the Floyd County Board of Education are subagents of the General Assembly. We do not believe a different result obtains simply because the actions were brought against the state agency created by the General Assembly to act as its *alter ego* with respect to its constitutional responsibility to provide an efficient system of common schools.

▮▮ Appellants could have sued the DOE and/or the Floyd County Board of Education alleging vicarious liability for the negligence of the faculty and staff of Betsy Layne High School in the Floyd Circuit Court except for the fact that both are shielded from liability by governmental immunity. *Yanero*, 65 S.W.3d at 519, 527 (state agency entitled to immunity from tort liability to the extent that it is performing a governmental function, local board of education is a state agency entitled to governmental immunity, and state agency is not vicariously liable for negligence of state employees). The "no vicarious liability" principle recognizes that an otherwise immune entity does not lose that status merely because its agents or servants can be held liable for the negligent performance of their ministerial duties. Otherwise, there could be no governmental immunity because state agencies perform their governmental functions by and through their agents, servants and employees.

▮▮ However, this action was not brought in a judicial court but in the Board of Claims. In enacting the Board of Claims Act, the General Assembly exercised its authority under Sections 230 and 231 of our Constitution to partially waive immunities enjoyed by otherwise immune entities. *Yanero, supra,* at 523–25.

It is the intention of the General Assembly to provide the means to enable a

person negligently injured by the Commonwealth, any of its cabinets, departments, bureaus or agencies, or any of its officers, agents or employees while acting within the scope of their employment by the Commonwealth or any of its cabinets, departments, bureaus or agencies to be able to assert their just claims as herein provided.

KRS 44.072. Does that include vicarious liability claims? KRS 44.073 provides, *inter alia:*

> (2) The Board of Claims shall have primary and exclusive jurisdiction over *all negligence claims for the negligent performance of ministerial acts* against the Commonwealth, any of its cabinets, *departments,* bureaus, or *agencies,* or any officers, agents, or *employees* thereof while acting within the scope of their employment by the Commonwealth or any of its cabinets, departments, bureaus, or agencies.
>
> . . .
>
> (15) Neither the Commonwealth nor any of its cabinets, departments, bureaus, or agencies or any officers, agents, or employees thereof shall be liable *under a respondeat superior theory* or any other similar theory *for the acts of independent contractors,* contractors, or subcontractors thereof or anyone else doing work or providing services for the state on a volunteer basis or pursuant to a contract therewith.

(Emphasis added.)

The term "ministerial acts" applies only to the negligence of public officers or employees who enjoy "official immunity" from liability for the "good faith," but negligent, performance of discretionary acts, but not for the negligent performance of ministerial acts. *Yanero, supra,* at 521–23. Thus, subsection (2) cannot pertain to the negligent acts of anyone other than a state official or employee. And subsection (2) cannot be interpreted as waiving the immunity of public officers and employees for their own ministerial acts because no such immunity exists. *Id.* at 522. Thus, the only possible meaning ascribable to subsection (2) is that it constitutes a waiver of the immunity of the Commonwealth or any of its cabinets, departments, bureaus, or agencies, or managerial officials and employees from vicarious liability for the negligent performance of ministerial acts by other officers, agents, or employees while in the course and scope of their employment. That conclusion is reinforced by subsection (15) which expressly does not waive immunity from vicarious liability for the negligent acts of anybody else. There would have been no need for subsection (15) if the General Assembly had not intended subsection (2) as a waiver of immunity from vicarious liability.

Appellants could have brought an action in the Floyd Circuit Court against appropriate members of the faculty and staff of Betsy Lane High School for the negligent performance of their ministerial duties. *Id.* at 529. In addition, they could have brought an action in the Board of Claims against either the Floyd County Board of Education [4] and/or the DOE (or the Commonwealth) on a theory of vicarious liability. They chose to bring an action only

---

4. The *obiter dictum* in *Board of Education of Rockcastle County v. Kirby,* Ky., 926 S.W.2d 455, 456–57 (1996), that an action cannot be brought in the Board of Claims against a local board of education was abrogated by the recognition in *Yanero,* 65 S.W.3d at 527, that a local board of education is a state agency, thus falling squarely within the language of KRS 44.072 and KRS 44.073(2).

against the DOE. Their failure to file a circuit court action against any or all of the responsible teachers or to file a Board of Claims action against the Floyd County Board is immaterial to their right to recover against the DOE. *Cohen v. Alliant Enterprises, Inc.*, Ky., 60 S.W.3d 536, 539 (2001).

## III. CLAIMS FOR LOSS OF CONSORTIUM.

' The loss of consortium claims are premised on our holding in *Department of Education v. Blevins*, Ky., 707 S.W.2d 782 (1986), that damages for loss of consortium were recoverable under the Board of Claims Act because they were not specifically excluded by KRS 44.070(1). *Id.* at 785. *Blevins* was rendered on April 10, 1986. Effective July 15, 1986, the General Assembly amended KRS 44.070(1) to exclude "collateral or dependent claims which are dependent on loss to another and not the claimant." 1986 Ky. Acts, ch. 499, § 3. That amendment abrogated the holding in *Blevins*.

Accordingly, we affirm the dismissal of the parents' claims for loss of consortium, reverse the dismissal of the administrator's wrongful death claim, and remand this action to the Board of Claims for further proceedings consistent with this opinion.

All concur.