**Dianne TURNER, Appellant,**

v.

**Brooke NELSON, etc., et al., Appellees.**

No. 2010–SC–000356–DG.

Supreme Court of Kentucky.

June 16, 2011.

Mark S. Fenzel, Dana Lucas Collins, Kevin Lee Chlarson, Middleton Reutlinger, Brown & Williamson Tower, Louisville, KY, Counsel for Appellant.

J. Dale Golden, Michael T. Davis, Melissa Thompson, Golden & Walters PLLC, Lexington, KY, Counsel for Appellees.

Opinion of the Court by Justice SCOTT.

This is an appeal from an opinion of the Court of Appeals reversing the summary judgment granted Appellant by the Fayette Circuit Court. The trial court granted Appellant, Dianne Turner, summary judgment on grounds that she was entitled to "qualified official immunity" from the claims that Appellee, Brooke Nelson, individually, and as next friend of F.B., asserted against her.

Because Turner's actions in this instance were discretionary in nature rather than ministerial, she is entitled to the defense of "qualified official immunity" as a matter of law, and for this and other reasons hereinafter set out, we hold that the trial court properly granted her motion for summary judgment. We, therefore, reverse the decision of the Court of Appeals and reinstate the summary judgment originally granted by the trial court.[1]

## I. *Background*

In November 2005, five-year-olds F.B. and C.Y. were female kindergarten stu-

---

1. As we perceive the Kentucky School Boards Insurance Trust (KSBIT) to still be a technical party to this litigation, this opinion collectively resolves issues against it since any liability it had was contingent on Turner's liability. No issues remain before us as to the Fayette County Public Schools or the Fayette County Board of Education.

dents in Dianne Turner's class at Southern Elementary School, a Fayette County public school. Turner had been teaching at Southern since 1990 and had been a kindergarten teacher for ten years before that. She had an exemplary record and had never been reprimanded or disciplined in any way.

On November 18, F.B. described an incident involving C.Y. to her mother, Nelson, who then reported the matter to Turner. The incident had allegedly occurred two days prior. Based upon Nelson's phone conversation with Turner that F.B. had complained that C.Y. had been "up her butt"[2]—and her own knowledge that F.B. often wore low cut jeans with her underwear showing in the back—Turner interpreted the events described to have been a playful "wedgie."

Despite her belief that the incident was just a childish prank, Turner separated F.B.'s and C.Y.'s seats in the classroom, forbid them from being together in or out of the classroom during school, and discussed with C.Y. that "touching other people on the bottom" is inappropriate. She also informed her teaching assistant of the alleged incident and of her plan to keep the children apart.

Three days later, F.B. told Turner after lunch that C.Y. had been "up [her] butt" again in the classroom during reading class. When then questioned by Turner, C.Y. admitted she had touched F.B., describing it as a "game we play at home." Turner then put her assistant in charge of the classroom and took C.Y. to find the principal, Ms. Collins, or a counselor. Neither were available that afternoon. No other reports of inappropriate touching were ever made to Turner.[3]

Later that evening, F.B. told her mother's sister, Bridget, that C.Y. had touched her genitals. Rather than contact Turner again, on November 22, Nelson spoke with Principal Collins. Collins indicated she was unaware of the previous incidents and subsequently had both children report to her office for a conference. During the conference, Collins learned that C.Y. had "accidentally hit F.B. in between the legs but that there was not an intentional reaching over and touching of F.B. on her vagina." Both girls described to Collins a game in which one would pull the waistband on the other's underwear or pants and yell "up your butt!" Moreover, both girls told her there was no anal violation, stating "that did not happen." Following the conference, Collins called Nelson and told her that she had gathered some facts and would continue her investigation.

At some point later that evening, F.B. told Nelson that C.Y. had pushed her into a table, rubbed and pinched her nipples, and touched her anus and vagina. Nelson then went to the school the next day and informed Collins and law enforcement (who were already there on another matter) of the incident and took F.B. to an emergency room for a medical examination.[4]

---

**2.** Nelson disagrees with this description; she claims she told Turner that F.B. said C.Y. had "put her finger up my butt."

**3.** In her deposition, Turner testified that "[i]f I understand that a child is truly sexually abusing another student, then I'm going to call Crimes Against Children."

**4.** The medical record noted "no obvious laceration" and that "there did appear to be some small irritation of the vagina, with no definite tear, blood seen [and] no discharge." According to Appellant's expert, Dr. David Shraberg, this irritation and a bruise were "possibly consistent with F.B.'s report of ... sexual play and roughhousing." However, he also noted a history of urinary tract infections which "can cause vaginal irritation as well." As to any other complaints, he noted F.B. "appears to have no medical complaints. In-

Nelson brought suit against Turner in 2006, alleging, among other causes of action not pertinent here, that she failed (1) to exercise ordinary care to supervise the children in her classroom and, (2) to report to enforcement officials the alleged sexual assault perpetrated by C.Y. as required by KRS 620.030.

On March 1, 2007, after discovery, the Fayette Circuit Court entered summary judgment in favor of Turner, concluding that Turner was entitled to "qualified official immunity" because her action—determining whether the facts constituted abuse—was discretionary in nature. The Court of Appeals, however, reversed and remanded the matter back to the trial court with directions to reconsider the mandatory abuse reporting obligation of KRS 620.030 or to provide further analysis as to how the determination of abuse was a discretionary act in light of the statute's mandatory reporting requirement.

On remand, the trial court set out in detail its reasoning for finding Turner's actions discretionary and again found "qualified official immunity" applicable. On further review, the Court of Appeals reversed and held that Turner was not entitled to "qualified official immunity" because the reporting requirement of KRS 620.030 is mandatory and therefore ministerial, obviating any application of "qualified official immunity." This Court then granted Turner's motion for discretionary review.

## II. *Analysis*

■ Summary judgment is proper when the evidence demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." CR 56.03. Thus, to defeat a properly supported motion, the respondent must "present[ ] at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Id.* at 482. In such considerations, however, "[t]he record must be viewed in a light most favorable to the party opposing the motion and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Service Center, Inc.,* 807 S.W.2d 476, 480 (Ky.1991). With this structure in mind, we review *de novo* the Court of Appeals' conclusion that Turner was not entitled to judgment as a matter of law.

## A. Duty to Report Pursuant to KRS 620.030

■ Turner argues that the mandatory reporting obligation of KRS 620.030(1) does not apply in this case. In support, she points to KRS 600.020(1), which generally addresses abuse by persons in a custodial or supervisory capacity. As a result, Turner contends that she did not violate KRS 620.030(1) because the complaint alleged commission of the act by a child, rather than by a person in a "supervisory or custodial capacity" as required, and further, even under Appellee's view of KRS 620.030, there has to be knowledge of an abuse or reasonable cause to believe it actually occurred before the reporting requirements of KRS 620.030(1) could apply; which there was not. We agree, but address the contentions separately.[5]

KRS 620.030(1) mandates that "[a]ny person who knows or has reasonable cause

---

sofar as emotional complaints, she did well not only at [the] Academy, but is doing well in the first grade. She does appear to be a rather somewhat 'chatty child.' "

**5.** Turner also contends that KRS 620.030 does not provide for a private cause of action. Because we have resolved this matter on other grounds, we do not address this specific issue.

to believe that a child is *dependent, neglected, or abused* shall immediately cause an oral or written report to be made...." (Emphasis added).[6]

In *Commonwealth v. Allen*, 980 S.W.2d 278, 279 (Ky.1998), this Court deemed the language of KRS 620.030(1) to be "clear and unambiguous." *Id.* at 281. However, *Allen* involved a teacher's report under KRS 620.030(1) that another teacher had engaged in sexual contact with two sixth-grade students. Here, we are called upon to interpret the mandatory reporting obligations of KRS 620.030(1) where the alleged perpetrator was a five-year-old classmate.

In so doing, we must be mindful of the commands of KRS 446.080(4), which states:

> All words and phrases shall be construed according to the common and approved usage of language, but technical words and phrases, and such others as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning.

In this regard, KRS 620.030(1) specifically refers to "a child [that] is dependent, neglected, or abused." It falls under KRS Chapter 620, which is entitled "Dependency, Neglect, and Abuse." And, KRS 600.020, which contains the definitions for KRS Chapters 600 to 645, defines an "[a]bused or neglected child" in subsection (1), in pertinent part, as:

> (1) "Abused or neglected child" means a child whose health or welfare is harmed or threatened with harm when his par-

ent, guardian, or other person exercising custodial control or supervision of the child:

> (a) Inflicts or allows to be inflicted upon the child physical or emotional injury as defined in this section by other than accidental means;
>
> (b) Creates or allows to be created a risk of physical or emotional injury as defined in this section to the child by other than accidental means;
>
> . . . .
>
> (e) Commits or allows to be committed an act of sexual abuse, sexual exploitation, or prostitution upon the child;
>
> (f) Creates or allows to be created a risk that an act of sexual abuse, sexual exploitation, or prostitution will be committed upon the child;
>
> . . . .

KRS 600.020(1). KRS 600.020(19) defines a "[d]ependent child."

For reasons that KRS 620.030(1) premises its application on "a child [who] is dependent, neglected, or abused," we cannot escape the determination, given the definitive and particular wording used, that these are technical words which "have acquired a peculiar and appropriate meaning in the law." KRS 446.080(4). Moreover, given the textual symmetry, we can find nothing in the context of KRS 620.030 which countermands the application of KRS 600.020(1).

■ Thus, under the plain language of KRS 600.020(1), the definition of an abused

---

**6.** KRS 620.050(1) provides, in pertinent part: Anyone acting upon reasonable cause in the making of a report or acting under KRS 620.030 ... in good faith shall have immunity from any liability, civil or criminal, that might otherwise be incurred or imposed.... However, any person who knowingly makes a false report and does so with malice shall be guilty of a Class A misdemeanor.

We surmise that KRS 620.050(1)'s reference to "the making of a report *or acting* under KRS 620.030" at a minimum contemplates and protects one in an initial investigation of the matter.

child is *limited* to a scenario in which his or her "parent, guardian, or other person exercising custodial control or supervision" inflicted or committed abuse, allowed abuse to be inflicted or committed, or created or allowed to be created a risk of abuse. As a result, the *mandatory* reporting requirement of KRS 620.030(1) does not apply when a child inappropriately touches another child *unless* a parent, guardian, or other person exercising custodial control or supervision allows such inappropriate touching to be committed or creates or allows such a risk of abuse.

Here, the allegations concern improper touching by a five-year-old girl of another five-year-old girl, not a parent, guardian, or other person exercising custodial control or supervision, as was the case in *Allen.*

In this case, Turner knew that C.Y. touched F.B. based upon her conversation with the children and Nelson. As a result, she separated their classroom seating and forbid them from being together during school hours. She even advised her classroom assistant of this. Thus one, in this circumstance, could not conclude that she allowed the touching or created or allowed the risk to be created. This is not to say that a report could not have been made in this instance, *see* KRS 620.030(1) and KRS 620.040(3), only that it was not mandated by KRS 620.030(1) for the reasons enunciated.

Thus, the mandatory reporting obligation of KRS 620.030(1) did not apply to Turner in this case, as the facts alleged did not constitute a mandatorily reportable "abuse" as envisioned by the legislature. Thus, there was no "genuine issue of material fact for trial." *Steelvest,* 807 S.W.2d at 482.

Although we agree with Turner that the statute did not apply, we pause to refute Nelson's expansive reading of KRS 620.030.

### 1. KRS 620.030(1)

KRS 620.030(1) continues beyond its initial mandate, imposing an additional requirement on the Cabinet for Health and Family Services:

> If the cabinet receives a report of abuse or neglect allegedly committed by a person other than a parent, guardian, or person exercising custodial control or supervision, the cabinet shall refer the matter to the Commonwealth's attorney or the county attorney and the local law enforcement agency or the Department of Kentucky State Police.

In light of the Cabinet's additional requirement, Nelson contends that it defies all logic that the legislature intended that the definition of "abused child" contained in KRS 600.020(1) would trump the directive of KRS 620.030(1) that all reasonable beliefs of abuse *by anyone* be reported. *See Hall v. Hospitality Resources, Inc.,* 276 S.W.3d 775, 785 (Ky.2008) (stating that "[w]e have often said that statutes will not be given [such a] reading where to do so would lead to an absurd or unreasonable conclusion.") (internal citations omitted). As a result, he posits that the Cabinet's additional reporting obligation conflicts with our interpretation.

Yet, our statutory interpretation neither contravenes the plain meaning of KRS 620.030(1) nor leads to an absurd or unreasonable conclusion. By its own words ("dependent, neglected, or abused"), the statute and its applicable definitions limit its reporting requirement to circumstances wherein a "parent, guardian, or other person exercising custodial control or supervision" inflicts or commits abuse, allows abuse to be inflicted or committed, or creates or allows a risk of abuse to be created. By adopting Nelson's interpretation

and applying the Cabinet's reporting obligations in this case, we would be adding language to the statute.

Moreover, we assume that the legislature acted intentionally in creating an additional mandatory duty for the Cabinet upon receipt of such a report but omitting it with respect to persons other than those in supervisory or custodial positions. *See Palmer v. Commonwealth,* 3 S.W.3d 763, 764–765 (Ky.App.1999) (stating that "where the legislation includes particular language in one section of a statute, but omits it in another section of the same Act, it is generally presumed that the legislature acted intentionally and purposefully in the disparate inclusion or exclusion") (citations omitted). Finally, while Nelson may find a clear reading of the statute unpalatable because she believes it does not adequately protect abused children,[7] a policy disagreement cannot be cast as an absurd or unreasonable result as a means to ignore the plain meaning of a statute.

### 2. KRS 620.030(2)

■ KRS 620.030(2) places additional duties upon teachers, and reads in pertinent part:

> Any person, including . . . a . . . *teacher* . . . who knows or has reasonable cause to believe that a child is dependent, neglected, or abused, *regardless of whether the person believed to have caused the dependency, neglect, or abuse is a parent, guardian, person exercising custodial control or supervision, or another person,* or who has attended such child as a part of his or her professional duties *shall, if requested,* in addition to the report required in subsection (1) of this section, file with the local law enforcement agency or the Department of Kentucky State Police or the Commonwealth's or county attorney, the cabinet or its designated representative within forty-eight (48) hours of the original report a written report . . .

(Emphasis added).

Nelson argues that the breadth of KRS 620.030 is demonstrated by subsection (2), which states that mandatory reporting is triggered for teachers "regardless of whether" the abuse was committed by a parent or guardian. According to Nelson, a clear reading of the statute shows that the legislature was trying to provide the broadest, most comprehensive protection available for children. However, Nelson ignores that this reporting requirement applies only "if requested." No such request was made to Turner by anyone. Moreover, the wording "in addition to the report required in subsection (1) of this section" cannot be read to expand the obligatory expanse of KRS 620.030(1); it merely recognizes the secondary report, if

---

7. We believe the statute adequately protects abused children while affording discretion to teachers such as Turner. For instance, a teacher confronted with inappropriate touching by one child upon another must contemplate a variety of concerns including, but not limited to, the developmental age of each child. And by reporting such an incident to law enforcement officials, without some investigation and analysis, a teacher risks automatically destabilizing the children involved and the classroom as a whole; alternative solutions, if appropriate, after an initial investigation, such as separating the children and explaining why certain touching is inappropriate, will often be preferable to immediate draconian sanctions with all their attendant consequences if the situation was, in fact, misinterpreted. If the belief of any violation remains, the teacher may—and should—report it. Such a scenario is explicitly recognized by KRS 620.030(1) to the effect "[i]f the cabinet receives a report of abuse or neglect allegedly committed by a person other than a parent, guardian, or person exercising custodial control or supervision, the cabinet shall refer the matter to the Commonwealth's attorney or the county attorney. . . ."

requested, is in addition to any report *required* by subsection (1).

## B. Qualified Official Immunity from Tort Liability

■ Turner also argues that she is entitled to "qualified official immunity" from suit. Specifically, she contends that her actions and alleged inactions in this case resulted from discretionary decisions.[8] As a result, she cannot be held liable for the tort of negligent supervision or for that matter, any statutory action for failure to file a report pursuant to KRS 620.030(1), had she violated it.[9] Again, we agree.

■ "As this Court thoroughly explained in *Yanero v. Davis*, when an officer or employee of the state or county (or one of its agencies) is sued in his or her individual capacity, that officer or employee enjoys qualified official immunity, 'which affords protection from damages liability for good faith judgment calls *made in a legally uncertain environment*.'" *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky.2010) (*quoting Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky.2001) (emphasis added)). And, qualified official immunity applies to statutory actions under KRS 446.070. *Clevinger v. Board of Educ. of Pike County*, 789 S.W.2d 5 (Ky.1990) ("[I]n this Commonwealth a School Board is protected by state sovereign immunity from a suit for money damages for an injury wrongfully

inflicted, whether the cause of action is common law or statutory....").

■ "[T]he analysis depends upon classifying the particular acts or functions in question in one of two ways: discretionary or ministerial." *Haney*, 311 S.W.3d at 240. "Qualified official immunity applies only where the act performed by the official or employee is one that is discretionary in nature. Discretionary acts are, generally speaking, 'those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment.'" *Id.* (internal citations omitted) (*quoting Yanero*, 65 S.W.3d at 522). "It may also be added that discretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued." *Haney*, 311 S.W.3d at 240. "On the other hand, ministerial acts or functions—for which there are no immunity—are those that require 'only obedience to the orders of others, or when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts.'" *Id.* (*citing Yanero*, 65 S.W.3d at 522). "Similarly, 'that a necessity may exist for the ascertainment of those [fixed and designated] facts does not operate to convert the [ministerial] act into one discretionary in its nature.'" *Haney*, 311 S.W.3d at 240–41

8. We recognize that qualified official immunity only applies where there is a showing that the discretionary act or function was performed in good faith and within the scope of the employee's authority. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky.2001). However, it is undisputed that Turner acted within the scope her employment as a teacher. Furthermore, Nelson failed to set forth facts showing that Turner acted in bad faith. *Id.* at 523 ("Once the officer or employee has shown prima facie that the act was performed within the scope of his/her discretionary authority, the burden

shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith."). As a result, our analysis focuses on whether her actions were discretionary.

9. Appellee raises questions regarding Appellant's preservation of this issue relating to Appellee's claim of negligence. However, Appellant did raise the issues in her motion for discretionary review. Thus, it was preserved.

(brackets in original) (*quoting Upchurch v. Clinton County,* 330 S.W.2d 428, 430 (Ky. 1959)).

In *Stratton v. Commonwealth,* 182 S.W.3d 516 (Ky.2006), we analyzed an investigation and the resulting conclusions of employees of the Cabinet for Families and Children in an instance where a young child was placed back into the home and subsequently re-injured and died as a result of caretaker abuse. The investigation and ultimately erroneous conclusions were analyzed in light of a regulation which required that "[c]ollateral contacts *shall* be interviewed if the validity or severity of the report cannot be determined from the interviews" of the victim, parents or caretakers, appropriate household and family members, and alleged perpetrators. *Id.* at 520 (emphasis added). The argument made was that they would have discovered the true identity of the perpetrator had they interviewed "collateral contacts."

During the course of the investigation, "information was obtained tending to place blame on the maternal grandmother. No information was ever conveyed identifying Mr. Davis [the mother's live-in boyfriend, and also a caretaker] as the abuser." *Id.* at 520–21. And, in responding to a subsequent call to an abuse hotline, Cabinet employees determined from the information gleaned from the following visit that the child's injuries were accidentally inflicted by a neighbor's son. These conclusions as to the perpetrator were ultimately proven wrong by the child's death.

In recognizing the application of qualified official immunity in that case, we noted "[s]uch investigations do have certain mandated statutory requirements as to who shall be interviewed, etc., but they also involve discretionary decisions by the case workers, just as in police investigations.... All such discretionary functions are protected by the doctrine of [qualified] governmental immunity...." *Id.* at 521.

In *Haney,* a camp counselor asserted qualified official immunity as a defense to a negligent supervision claim. 311 S.W.3d at 239. The counselor had received a "single oral instruction to keep the children in the middle of the path ... during a 10 to 15 minute training session" on how to conduct a hiking activity. *Id.* at 242 (internal quotations omitted). Although given to ensure the safety of the activity, we refused to deem enforcement to be ministerial because the instruction to keep the children in the middle of the path created "a general and continuing supervisory duty ... which depended upon constantly changing circumstances—indeed, the continuing moment-by-moment, wormlike movement of all the children upon the path." *Id.* at 243. Moreover, the instruction did not say "how to 'keep' the children in the middle of the path should they suddenly stray from it." *Id.* During this nature walk, as required, the children were blindfolded. Once they strayed—as they often did—"she chose to caution the children that they were getting too close to the path's edge. Unexpectedly, this apparently created a chain reaction of tripping behind the leader." *Id.* at 244. We found her actions in deciding how and what to do to be discretionary.

■ Here, aside from KRS 620.030(1), Turner had a duty "to take all reasonable steps to prevent foreseeable harm to [her] students." *Williams v. Kentucky Department of Education,* 113 S.W.3d 145, 148 (Ky.2003) (citations omitted).[10] And, in furtherance of the call from Nelson and

---

10. "The basic premise for this duty is that a child is compelled to attend school so that the protective custody of teachers is mandatorily substituted for that of the parent." *Williams,* 113 S.W.3d at 148 (citations omitted) (footnote omitted) (internal quotations omitted).

F.B.'s subsequent comment to her, Turner separated F.B. and C.Y. in the classroom, directed that they not be together during school, and explained to C.Y. that such touching was inappropriate, although she believed from all she knew and had discovered that that the incidents were the childish pranks of giving one another "wedgies" and yelling "up your butt!" For further assurance, she also informed her teaching assistant of the incident and of her plan to keep the children apart. And, after F.B. told her that C.Y. had been "up [her] butt" again, she took C.Y. aside, discussed what had occurred, and tried to find the principal or a counselor that day, which she did not. She was not advised of any later incident by F.B. or her mother.

Relying upon our rationale in *Stratton* and *Haney*, we consider Turner's actions in supervising the children to have been discretionary. While there may be legitimate disagreement as to the approach taken by Turner, the consequences of liability under such circumstances would injuriously "deter independent action and impair the effective performance of [teaching] duties." *Id.* at 245.

It is imperative that teachers maintain the discretion to teach, supervise, and appropriately discipline children in the classroom. To do this, they must have appropriate leeway to do so, to investigate complaints by parents, or others, as to the conduct of their students, to form conclusions (based on facts not always known) as to what actually happened, and ultimately to determine an appropriate course of action, which may, at times, involve reporting the conduct of a child to the appropriate authorities. In fact, protection of the discretionary powers of our public officials and employees, exercised in good faith, is the very foundation of our doctrine of "qualified official immunity."

Although we consider Turner's conduct in this case to be discretionary, we recognize the apparent incongruity with our precedent regarding a supervisory duty in the public school setting, as "we have held that a claim of negligent supervision may go to a ministerial act or function in the public school setting." *Id.* at 244. However, *Yanero v. Davis*, 65 S.W.3d 510 (Ky. 2001) and *Williams*, 113 S.W.3d 145—the cases relied upon in enunciating the public school distinction—have quite different facts from those before us. *Id.*

In *Yanero*, this Court deemed "enforcement of a known rule requiring that student athletes wear batting helmets during baseball batting practice" to be ministerial. 65 S.W.3d at 522. Unlike the teacher's decision-making in this case, a helmet requirement constitutes "an essentially objective and binary directive." *Haney*, 311 S.W.3d at 242 (*discussing Yanero*, 65 S.W.3d 510). As a result, "[t]here is no substantial compliance with such an order and it cannot be a matter of degree: its enforcement was absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (citation omitted) (internal quotation omitted). You do it or you don't—and unlike here, there is no factual determination required for its application.

Admittedly, we have also "rejected the notion that the *failure* of teachers ... to supervise their students in the face of known and recognized misbehavior was a discretionary act." *Id.* at 244 (*discussing Williams*, 113 S.W.3d at 150). This decision stemmed from the requirement in KRS 161.180(1) that teachers must "hold pupils to strict account for their conduct on school premises, on the way to and from school, and on school sponsored trips and activities." *Id.* The dispute in this case, though, concerns the *means* of supervision rather than a *failure* to supervise students

who were drinking and driving to and from a school-sponsored function as occurred in *Williams.*

Moreover, even had we agreed with Appellee's position that KRS 620.030 mandated reports covering children touching or abusing each other and was thus actionable under KRS 446.070,[11] qualified official immunity would still be applicable as the trial court aptly noted. KRS 620.030(1) only directs reporting by a "person who knows or has reasonable cause to believe that a child is ... abused." Thus, where there is no actual knowledge of the event, there must be an objective determination that a reasonable belief existed. *Rowan County v. Sloas,* 201 S.W.3d 469, 482 (Ky. 2006) ("We make this ... inquiry in light of the information that the defendant official possessed at the time of the incident in question ... and cognizant of the fact that public officials generally are not hermetic, ivory-tower scribes versed in the vagaries of ... law." ') (*quoting Kegler v. City of Livonia,* 173 F.3d 429 (6th Cir.1999)); *see also Jefferson County Fiscal Court v. Peerce,* 132 S.W.3d 824, 834 (Ky.2004). Thus, as the learned trial judge noted in her second summary judgment following remand:

> In conducting such an analysis, it is necessary to first review KRS 620.030.... Subsection 1 of this statute states, "[a]ny person *who knows or has reasonable cause to believe* that a child is ... abused shall immediately cause an oral or written report to be made to ..." (the appropriate authorities then listed).
>
> It is clear from this language that the mandatory reporting requirement applies only when a person "knows" or has

"reasonable cause to believe" that a child has been abused. The statute clearly does not require the reporting of every allegation of sexual abuse or the reporting of a mere suspicion. The legislature could have required reporting on a mere allegation or statement, but the standard is clearly higher. As stated by the Kentucky Supreme Court in *Beckham v. Board of Education of Jefferson County,* 873 S.W.2d 575, 577 (Ky. 1994).

> As with any case involving statutory interpretation, our duty is to ascertain and give effect to the intent of the General Assembly. We are not at liberty to add or subtract from the legislative enactment nor discover mean[ing] not reasonably ascertainable from the language used.

There is no claim in this case that Turner witnessed F.B. being abused or had any personal knowledge that F.B. was abused. Her only information about the event alleged came from what she was told by two five-year[-]old children. There appear to be no other witnesses to the alleged events. These circumstances required Turner to make a judgment about what may have happened and respond appropriately. It is noted that the principal also interviewed these two children and concluded the incidents were accidents and did not report the matter to any other authorities.

Since Turner did not have actual or personal knowledge of the events alleged, the only other basis upon which she was required to make a report would be the development of a "reasonable cause to believe" that one of the children had been abused. Making such

---

11. KRS 446.070 provides that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." A first offense violation of 620.030(1) is a Class B misdemeanor.

a determination clearly involves the exercise of discretion. It is similar to a judicial decision that there is or is not probable cause to support an asserted proposition. The very purpose of the doctrine of qualified official immunity is to protect government officials exercising discretion from second-guessing of their good faith decisions made in difficult situations such as this. The essence of reaching a determination as to whether reasonable cause exists would require discretion. This requires that Turner make reasonable inquiry into the facts, weighing the credibility of each child and then using her judgment and experience of a teacher of kindergarten level students, to reach a decision as to whether there was reasonable cause to believe that sexual abuse had occurred.

As the trial court recognized, this typifies a "legally uncertain environment." *Yanero*, 65 S.W.3d at 522 ("[Q]ualified official immunity ... affords protection from damages liability for good faith judgment calls made in a legally uncertain environment.").

Because Turner's actions were discretionary in this case and because she was entitled to qualified official immunity, she could not be held liable for the tort of negligent supervision or the statutory action under KRS 446.070.

### III. *Conclusion*

For the foregoing reasons, the decision of the Court of Appeals is hereby reversed and the summary judgment of the trial court is reinstated.

All sitting. All concur.