RENDERED:  FEBRUARY 5, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0248-MR

CHARLES E. BROWNING, JR.                                    APPELLANT

APPEAL FROM PERRY CIRCUIT COURT
v.          HONORABLE JOHNNY RAY HARRIS, JUDGE
ACTION NO. 14-CI-00064

E.G.B., A MINOR CHILD,
THROUGH AND ON BEHALF OF HIS MOTHER,
ANGIE BAKER                                                APPELLEE

OPINION
REVERSING AND REMANDING

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; COMBS AND JONES, JUDGES.

CLAYTON, CHIEF JUDGE:  Charles E. Browning ("Browning"), the former

principal of Chavies Elementary ("Chavies"), sought qualified immunity from a

suit brought by E.G.B. and his mother ("Mother") based on sexual abuse

perpetrated against E.G.B. by another student at Chavies.  The Perry Circuit Court

denied Browning's motion for summary judgment based on his claim of qualified official immunity. Because we agree with Browning that his actions were discretionary and in good faith, we reverse and remand this matter for further proceedings in accordance with this opinion.

## BACKGROUND

Browning was the principal at Chavies from 2004 through the spring of 2013. E.G.B. alleged that certain acts of sexual abuse occurred at Chavies in both 2012 and 2013, at the beginning of E.G.B.'s kindergarten and first grade years, respectively. At those times, E.G.B. was five and six years old and C.E.B. was thirteen and fourteen years old. According to the victim impact statement, E.G.B. stated that C.E.B. fondled him, inserted his finger into E.G.B.'s rectum, and forced him to perform oral sex acts in the Chavies bathroom by the gym/cafeteria during the morning hours before the school day officially began. Students in grades kindergarten through eighth grade would go into the gym/cafeteria to eat breakfast and wait until classes started. The morning, in the gym/cafeteria, was the only time of day that students of all ages could go to the bathroom alone without supervision. The staff assigned to supervise the children in the gym/cafeteria in the mornings changed each day.

Less than a month after E.G.B. started the first grade, he informed Mother that he had been sexually assaulted by an older student at Chavies. At that

point, Browning had resigned as the principal at Chavies to become the Perry County School District Athletic Director and Safe School Coordinator, and Regina Meehan had succeeded Browning as principal of Chavies for the 2013-14 school year.

In response to E.G.B.'s allegations, Mother had E.G.B. look through an old Chavies yearbook and asked him to point out the student who had assaulted him. E.G.B. identified C.E.B., an eighth-grade special needs student, as the perpetrator. Mother thereafter contacted Meehan, who then contacted the superintendent, who in turn contacted the Kentucky State Police and the Cabinet for Health and Family Services (the "Cabinet"). C.E.B. was removed from Chavies by a Kentucky State Police detective and, in January of 2014, C.E.B. entered an admission to two counts of first-degree sexual abuse, with a provision that he was mentally ill, in a juvenile case heard in Perry District Court.

On February 27, 2014, E.G.B., through and on behalf of Mother, filed a complaint against Browning, along with other administrators and E.G.B.'s kindergarten teacher, in their individual capacities. E.G.B. filed an amended complaint on July 28, 2014, clarifying E.G.B.'s claims, which included violation of E.G.B.'s civil rights, failure to supervise, failure to report, and failure to implement the student discipline code.

Browning moved for summary judgment on November 14, 2016, arguing his entitlement to immunity and emphasizing that he was the principal at Chavies through the spring of 2013 and, as Mother had not become aware of the sexual assaults or identity of the perpetrator of such assaults until September of 2013, Browning contended that he could not be held liable for failure to supervise, report, or implement a student discipline code. Subsequently, on March 22, 2017, the circuit court entered an order denying Browning's motion for summary judgment, simply stating that the motions for summary judgment were overruled.

On appeal, a panel of this Court remanded the matter with instructions to the circuit court to clarify the effect of its order as to the question of qualified immunity. Upon remand, the circuit court determined that Browning had failed to perform the ministerial function of investigating C.E.B.'s conduct towards other female students at Chavies. Therefore, the court found that Browning was not entitled to qualified immunity. This appeal by Browning followed.

Further facts will be discussed as they become relevant herein.

## ANALYSIS

### a. Standard of Review

Summary judgment is generally appropriate where "the pleadings, depositions, answers to interrogatories, stipulations and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law." Kentucky Rule of Civil Procedure (CR) 56.03.

In the context of qualified official immunity, "'[s]ummary judgments play an especially important role' as the defense renders one immune not just from liability, but also from suit itself." *Ritchie v. Turner*, 559 S.W.3d 822, 830 (Ky. 2018) (citations omitted). An appeals court reviews the issue of whether a school official is entitled to qualified official immunity *de novo*. *Id*. (citation omitted).

### b. Discussion

### 1. Qualified Official Immunity

As the Kentucky Supreme Court explained in *Yanero v. Davis*, when an officer or employee of the state or county is sued in his or her individual capacity, that officer or employee is often entitled to qualified official immunity, "which affords protection from damages liability for good faith judgment calls made in a legally uncertain environment." 65 S.W.3d 510, 522 (Ky. 2001) (citation omitted). The application of qualified immunity "rests not on the status or title of the officer or employee, but on the function performed." *Id*. at 521 (citation omitted). Specifically, "the analysis depends upon classifying the particular acts or functions in question in one of two ways: discretionary or ministerial." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010), *as corrected* (May 7, 2010).

As explained in *Haney*:

> Discretionary acts are, generally speaking, those involving the exercise of discretion and judgment, or personal deliberation, decision, and judgment. It may also be added that discretionary acts or functions are those that necessarily require the exercise of reason in the adaptation of means to an end, and discretion in determining how or whether the act shall be done or the course pursued. Discretion in the manner of the performance of an act arises when the act may be performed in one or two or more ways, either of which would be lawful, and where it is left to the will or judgment of the performer to determine in which way it shall be performed.

*Id.* at 240 (internal quotation marks and citations omitted).

On the other hand, qualified immunity does not protect one who negligently performs, or fails to perform, a ministerial duty. "A ministerial duty is one that requires only obedience to the orders of others." *Patton v. Bickford*, 529 S.W.3d 717, 724 (Ky. 2016) (internal quotation marks and citation omitted). Put another way, "a duty is ministerial when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (internal quotation marks and citation omitted).

In the context of qualified official immunity in the public school setting, in *Williams v. Kentucky Department of Education*, the Kentucky Supreme Court explained that a "special relationship" is formed between a Kentucky school district and its students compelled to attend school such that there is "an affirmative duty on the district, its faculty, and its administrators to take all

reasonable steps to prevent foreseeable harm to its students." 113 S.W.3d 145, 148 (Ky. 2003) (citations omitted).

Under this general duty to protect students within their custodial control, Browning had more specific duties imposed by various statutes and school policies to report abuse and neglect and to supervise the students. E.G.B. alleges that Browning breached the duties imposed by these statutes and school policy. In response to Browning's contention that his alleged negligent conduct was discretionary in nature and, therefore, that he is immune from suit, E.G.B. argues that the challenged conduct was ministerial in nature and not subject to the discretionary function exception. We will first review whether Browning's functions under each statute or policy to determine whether they were ministerial or discretionary.

## 2. **Duty to Report**

### a. **Kentucky Revised Statute (KRS) 620.030**

The crux of the circuit court's decision to deny immunity to Browning was based on the circuit court's determination that Browning had failed to both perform an investigation under KRS 620.030 regarding C.E.B.'s sexualized behavior towards other female students, thereby allowing C.E.B. to continue abusing E.G.B.

A brief timeline of C.E.B.'s behavioral history is helpful to gain an overall understanding of the issues concerning whether Browning sufficiently investigated C.E.B.'s sexualized behaviors towards other female students and any duty Browning had to report such behaviors to the authorities. Per special education determination evaluations, C.E.B. was diagnosed as having a Mild Mental Retardation and a full-scale IQ of 65. C.E.B. spent his kindergarten through fourth grade years at the Perry County Alternative School (the "Alternative School") due to behavioral and academic issues. In 2009, C.E.B. returned to regular classroom education at Chavies, where he repeated the fourth grade due to maturity and academic issues.

In November 2009, C.E.B. was admitted to Creekside Children's Crisis Stabilization Unit for seven days based upon his school counselor's referral. C.E.B.'s referral form stated that C.E.B. had attempted to grab a female student's bottom and pull up her shirt, along with other attempts to touch females inappropriately. The foregoing behaviors were not recorded in C.E.B.'s Chavies behavior detail report, and no record indicates whether C.E.B. was disciplined at school for such actions.

In 2010, when C.E.B. was in fifth grade, he was caught at Chavies pressing himself against a girl and then pressing her into a desk. Such incident was recorded as "sexual misconduct" in C.E.B.'s behavior detail report, and the report

-8-

stated that he received discipline for such incident. C.E.B.'s behavior report further indicated that he received discipline for bus safety violations in September 2011, and disrespectful behavior in December 2011, as well as an out-of-school suspension for fighting in March 2011.

In June 2011, C.E.B. was admitted to The Ridge Behavioral Health Systems ("The Ridge") for nine days due to increased defiance and out of control behaviors and verbal and physical aggression. It is unclear the extent to which Chavies was made aware of C.E.B.'s stay at The Ridge as it was not during the school year and, based on privacy laws, there is no record that the school received any reports regarding such stay.

In 2012, C.E.B.'s Chavies behavior detail report stated that he was disciplined in September 2012, for smoking on campus grounds and in October 2012, for vulgar language. Additionally, C.E.B. was admitted to Rivendell Behavior Health Services ("Rivendell") in November 2012, for approximately one week. Particularly, C.E.B.'s Rivendell Discharge Summary, dated November 13, 2012, stated that C.E.B. was admitted to the facility "for worsening mood swings with episodes of severe aggression and inappropriate sexual behavior." The discharge summary further stated that C.E.B. "had been displaying inappropriate sexual behaviors including viewing pornography with peers at school and [a] recent incident where he was found to have been masturbating around the family

dog." Again, it is unclear the extent to which the school was privy to these records.

In December 2012, while C.E.B. was back at Chavies in the seventh grade, he made a penis out of Play-Doh and asked a female student to sit on it. These actions resulted in an out-of-school suspension for one day.

Thereafter, on January 10, 2013, the Admissions and Release Committee ("ARC") at Chavies – a group of individuals that is responsible for developing, reviewing, and revising an Individual Education Program ("IEP") for a child with a disability – met to discuss C.E.B.'s inappropriate behavior. Browning led this meeting. The ARC Summary Report from that meeting stated that C.E.B. had exhibited behaviors of a sexual nature recently that had resulted in several girls complaining about his action. Browning reported at that meeting that C.E.B. stated to him – presumably during Browning's investigation into the reports he had received concerning C.E.B.'s behavior – that sex was all that C.E.B. could think about. The report further stated that C.E.B. may have been masturbating in the school restroom and on the bus, as well as touching himself in the classroom.

Based on the foregoing behaviors, the ARC agreed that C.E.B. should be removed from Chavies and placed at the Alternative School for forty-five days where his behavior could be more closely monitored. The ARC's decision was implemented, and C.E.B. was moved to the Alternative School in January 2013.

Thereafter, the ARC met on April 8, 2013 to review C.E.B.'s progress. The summary notes from such meeting indicated that, while C.E.B.'s Alternative School teacher felt that C.E.B. could return to the regular classroom setting at Chavies, Browning did not agree. Therefore, the ARC agreed that the most appropriate decision was for C.E.B. to finish the school year at the Alternative School. The ARC recommended that C.E.B. begin the following school year at Chavies, but with the stipulation that any inappropriate behaviors would immediately warrant his return to the Alternative School. The summary further indicated that many of C.E.B.'s inappropriate behaviors had not been properly reported by staff and the bus driver. The Perry County School District Special Education Director stated that he would discuss with staff that any inappropriate behaviors needed to be reported and documentation of such behaviors needed to be kept in C.E.B.'s Special Education folder.

Turning to the applicable statute, KRS 620.030(1) mandates that:

[a]ny person who knows or has reasonable cause to believe that a child is dependent, neglected, or abused shall immediately cause an oral or written report to be made to a local law enforcement agency or to the Department of Kentucky State Police, the [C]abinet or its designated representative, the Commonwealth's attorney, or the county attorney[.]

As stated by the Kentucky Supreme Court, "[a] careful examination of KRS 620.030 makes clear that its framework for reporting cases of suspected child

abuse includes elements of both ministerial and discretionary conduct." *Ritchie*, 559 S.W.3d at 837. Further, the *Ritchie* court noted that, "[b]ecause few acts are ever purely discretionary or purely ministerial, our analysis considers the *dominant* nature of the act." *Id*. (internal quotation marks and citation omitted) (emphasis in original).

In cases where the alleged abuse was not actually observed by the official who allegedly failed to report such conduct, "KRS 620.030 first requires a baseline determination" as to whether "reasonable cause" exists "to believe abuse has occurred or was occurring[.]" *Id*. at 838. "To make that decision, the official must do some investigation after a potential issue of abuse is brought to his or her attention; the requirement to investigate, to ascertain the facts, is plainly a ministerial function." *Id*. On the other hand, "[a]ssessing the information gathered from the investigation and making the actual determination of whether reasonable cause exists to believe abuse is occurring or has occurred . . . requires personal judgment, a discretionary function." *Id*. As a result, "[t]he dominant act in cases where the alleged abuse is not actually observed (or otherwise known with reasonable certainty) and an investigation is required to determine reasonable cause is discretionary." *Id*. (footnote omitted).

In this case, we disagree with the circuit court that no evidence was put forth that Browning had investigated C.E.B.'s sexualized behavior towards the

other female students.  The entire purpose of the January 2013 ARC meeting was to investigate and discuss C.E.B.'s sexualized behaviors towards his classmates, and summary notes from that meeting indicated that Browning had already spoken to C.E.B. regarding such behaviors as part of such an investigation.  Moreover, the ARC ultimately determined at that meeting that C.E.B. should be moved to the Alternative School as a direct result of such behaviors towards the other female classmates.

Additionally, when C.E.B.'s special education teacher recommended that C.E.B. be moved back to his regular classroom at Chavies in April 2013, Browning recommended that C.E.B. remain in the Alternative School and not be returned to regular classes at Chavies through the remainder of the school year. Presumably, Browning would not have disagreed with C.E.B.'s special education teacher without having done some independent investigation of the situation.

By the time that C.E.B. returned to Chavies in the fall of 2013, Browning had moved on to another position and was no longer the principal of Chavies.  In sum, therefore, during Browning's tenure as principal of Chavies, C.E.B.'s sexual behavior towards other female students was discussed by the ARC, and as a result C.E.B. was removed to the Alternative School where he could be more closely monitored.  Further, based on Browning's recommendation, C.E.B.

was kept at the Alternative School through the end of the school year, contrary to the recommendation of C.E.B.'s special education teacher.

We find the foregoing actions to have satisfied any ministerial duty Browning had to investigate C.E.B.'s behavior under KRS 620.030. As a result, the Kentucky Supreme Court has stated that once the ministerial duty of investigation has been fulfilled, any actions thereafter are purely discretionary. *Ritchie*, 559 S.W.3d at 838. Indeed, "[a]ssessing the information gathered from the investigation and making the actual determination of whether reasonable cause exists to believe abuse is occurring or has occurred … requires personal judgment, a discretionary function." *Id*.

Moreover, in *Turner v. Nelson*, the Kentucky Supreme Court focused on the "reasonable cause to believe" language of KRS 620.030 to determine that a teacher's duty to report was discretionary under the statute. 342 S.W.3d 866, 877 (Ky. 2011). In *Turner*, a mother brought suit against her child's teacher alleging that the teacher had failed to report an alleged sexual assault perpetrated by another student against her child while at school to law enforcement as required by KRS 620.030. *Id*. at 870.

After determining that KRS 620.030 was inapplicable because the teacher had not created a risk of abuse, the *Turner* court determined that the teacher would still be entitled to the protection of qualified official immunity even

if KRS 620.030 was applicable. *Id.* at 877. The Court noted that KRS 620.030 only directed reporting by a "person who knows or has reasonable cause to believe that a child is . . . abused." *Id.* (citing KRS 620.030(1)). The teacher in *Turner* had not personally witnessed any acts of sexual assault or abuse between her students but rather had only heard of them from others. *Id.* The Court reasoned that "where there is no actual knowledge of the event, there must be an objective determination that a reasonable belief existed." *Id.* (citation omitted). Recognizing that these actions were clearly discretionary in nature, the *Turner* court held the teacher was entitled to qualified official immunity. *Id*. at 877-78.

As a result, because we believe that Browning satisfied any ministerial duty that he had to investigate C.E.B.'s sexualized behaviors towards his classmates under KRS 620.030, any further actions were discretionary under both *Ritchie* and *Turner*.

### b. **KRS 158.154**

E.G.B. next contends that Browning had a duty to report under KRS 158.154, which states:

> When the principal has a reasonable belief that an act has occurred on school property. . . involving . . . a sexual offense . . . the principal shall immediately report the act to the appropriate local law enforcement agency.

Under a plain reading of the statue, KRS 158.154 contains the same "reasonable belief" language that KRS 620.030 contains. It stands to reason,

-15-

therefore, that – like KRS 620.030 – once Browning conducted an investigation, any decision to report or not to report was a discretionary action.

### 3. **Duty to Supervise**

E.G.B. next claims that Browning breached his duty to supervise. Generally, a principal has a "duty to look out for the safety of the students[,]" which is clearly "discretionary in nature." *Marson v. Thomason*, 438 S.W.3d 292, 300 (Ky. 2014). E.G.B. claims, however, that Browning had a ministerial duty to supervise under both KRS 161.180 and various Perry County School Board ("PCSB") Policies.

Specifically, E.G.B. argues that Browning had a ministerial duty to supervise under PCSB Policy 09.221. However, as noted by C.E.B., PCSB Policy 09.221 was not adopted until 2016, long after the incidents in this case occurred and Browning left the position of principal at Chavies. We therefore decline to utilize such policy in analyzing Browning's potential qualified immunity. Additionally, the Kentucky Supreme Court has stated that the duty in Policy 09.221 to provide student supervision is discretionary. *See Ritchie*, 559 S.W.3d at 832.

E.G.B. further argues that KRS 161.180 created a ministerial duty to supervise on the part of Browning. KRS 161.180(1) states, in part:

> Each teacher and administrator in the public schools shall
> in accordance with the rules, regulations, and bylaws of

the board of education made and adopted pursuant to KRS 160.290 for the conduct of pupils, hold pupils to a strict account for their conduct on school premises, on the way to and from school, and on school sponsored trips and activities.

As stated in *Ritchie*:

[l]ike the general duty . . . to provide a safe school environment, the duty in KRS 161.180(1) . . . to provide student supervision "is a discretionary function [for school officials] exercised most often by establishing and implementing [supervision] policies and procedures," which is qualitatively different from actually supervising the students, a ministerial duty for those who are assigned such supervision.

*Ritchie*, 559 S.W.3d at 832 (quoting *Marson*, 438 S.W.3d at 302). As described in *Ritchie*, the statutory language allows for considerable discretion on the part of teachers and administrators in satisfying the mandates of KRS 161.180. As a result, KRS 161.180 did not create a ministerial duty on the part of Browning.

Finally, we note that the Kentucky Supreme Court has said the following regarding the difference between ministerial and discretionary duties in the school supervisory setting:

Although we consider Turner's conduct in this case to be discretionary, we recognize the apparent incongruity with our precedent regarding a supervisory duty in the public school setting, as "we have held that a claim of negligent supervision may go to a ministerial act or function in the public school setting." *Id*. at 244. However, [*Yanero*] and *Williams* . . . —the cases relied upon in enunciating the public school distinction—have quite different facts from those before us. *Id*.

-17-

In *Yanero*, this Court deemed "enforcement of a known rule requiring that student athletes wear batting helmets during baseball batting practice" to be ministerial. 65 S.W.3d at 522. Unlike the teacher's decision-making in this case, a helmet requirement constitutes "an essentially objective and binary directive." *Haney*, 311 S.W.3d at 242 (discussing *Yanero*, 65 S.W.3d 510). As a result, "[t]here is no substantial compliance with such an order and it cannot be a matter of degree: its enforcement was absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* (citation omitted) (internal quotation omitted). You do it or you don't—and unlike here, there is no factual determination required for its application.

Admittedly, we have also "rejected the notion that the failure of teachers . . . to supervise their students in the face of known and recognized misbehavior was a discretionary act." *Id.* at 244 (discussing *Williams*, 113 S.W.3d at 150). This decision stemmed from the requirement in KRS 161.180(1) that teachers must "hold pupils to strict account for their conduct on school premises, on the way to and from school, and on school sponsored trips and activities." *Id.* The dispute in this case, though, concerns the means of supervision rather than a failure to supervise students who were drinking and driving to and from a school-sponsored function as occurred in *Williams*.

*Turner*, 342 S.W.3d at 876-77.

We hold that the situation in the present case is analogous to that in *Turner*. Here, Browning was not merely enforcing a rule, as the record reflects that the school did not have a policy in place regarding bathroom procedures or supervision of students while in the bathroom. Rather, such was a discretionary

task utilizing judgment in the method of supervising the children in relation to addressing C.E.B.'s disciplinary problems. Because the facts of this case establish that the issue in this case was the means of supervision – even if there might be a legitimate disagreement regarding the means used – rather than a failure to supervise, Browning's actions were discretionary pursuant to *Turner*.

4. **Good Faith**

As described in *Yanero*, a "good faith" qualification exists for discretionary acts. *Yanero*, 65 S.W.3d at 523. Specifically, the *Yanero* Court stated that:

> in the context of qualified official immunity, "bad faith" can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, *i.e.*, objective unreasonableness; or if the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a corrupt motive. Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith.

*Id.* (citations omitted). Here, E.G.B. has failed to allege with specificity any facts that show evidence of the foregoing, which it was his burden to establish. *Id.* Further, our review of the record has failed to reveal objective unreasonableness or

-19-

willful or malicious intent to harm on the part of Browning.  *Id.*  Therefore, we cannot say that Browning performed the discretionary actions in bad faith.

## CONCLUSION

For the foregoing reasons, the Perry Circuit Court's order denying Browning's motion for summary judgment based on qualified immunity is reversed, and this matter is remanded with directions for the circuit court to enter an order granting Browning's motion for summary judgment based upon qualified immunity.

ALL CONCUR.

BRIEFS FOR APPELLANT:

Jason A. Snyder
Cincinnati, Ohio

BRIEF FOR APPELLEE:

Lori M. Hayden
Louisville, Kentucky