RENDERED: AUGUST 6, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-0501-MR

BRENDA COOK, INDIVIDUALLY AND AS MOTHER
AND NEXT FRIEND OF S.C.                                          APPELLANT

|                | APPEAL FROM JEFFERSON CIRCUIT COURT |
| v.             | HONORABLE AUDRA J. ECKERLE, JUDGE   |
|                | ACTION NO. 17-CI-001292             |

LAWANDA IRVIN AND MARIA HOLMES                          APPELLEES

OPINION
AFFIRMING

** ** ** ** **

BEFORE: GOODWINE, KRAMER, AND MAZE, JUDGES.

MAZE, JUDGE: Appellant, Brenda Cook, individually and as mother and next

friend of S.C. ("Mother"), appeals the Jefferson Circuit Court's summary judgment

order in favor of Appellees, LaWanda Irvin and Maria Holmes. For the following

reasons, we affirm.

BACKGROUND

This case involves S.C.,[1] a ten-year old girl who was injured at school while being physically restrained by the principal, Maria Holmes ("Principal Holmes"), and assistant principal, LaWanda Irvin ("AP Irvin"). S.C. was a special-needs student at Kerrick Elementary, which is a public school. S.C.'s disabilities included separation anxiety, post-traumatic stress disorder (PTSD), depression, oppositional defiant disorder, mood disorder, anxiety, asthma, and migraines. Many of S.C.'s disabilities were the result of tragic circumstances in her life. S.C.'s father died when she was young and, a few months before the incident at issue, S.C. was molested by some fellow students. Even though S.C. reported the sexual assault, the fellow students were not punished, which made S.C. distrustful of the staff at her school.

In 2013, due to S.C.'s disabilities and behavioral issues, the school developed a Behavior Intervention Plan (BIP)[2] to prevent S.C. from attempting to run away from staff.[3] Under the BIP, if S.C. attempted to run away from staff, she

_____

[1] This case involves a minor child. The Court will refer to the child as "S.C." to protect the child's identity.

[2] A BIP is a plan that teaches and rewards good behavior with the purpose to prevent or stop misbehavior. Such a plan is usually attached to a special education student's Individualized Education Program (IEP).

[3] The date of S.C.'s BIP is unclear. The BIP is dated October 8, 2013, although the six-week monitoring reports contained within the BIP begin on September 23, 2013.

would be "taken to a de-escalation room and allowed to calm down and then process the situation . . . ." The BIP did not address physically restraining S.C. in the event she attempted to run away from staff. However, a section of the BIP notes that "Safe Crisis Management" will be used if S.C. is a harm to self or others.

On December 2, 2013, the day at issue, S.C.'s mother dropped her off at school. S.C. attempted to run back to her mother and leave the school building. The events that followed are in dispute.

According to Mother, school staff "locked" S.C. in the assistant principal's office to cool off. Before S.C. cooled off, however, she was let out of the office. Principal Holmes attempted to hold S.C. to prevent her from running away. Because Principal Holmes was having trouble maintaining control over S.C., AP Irvin came over and "offered to grab her legs." In the process, S.C. was dropped on the concrete/tile floor causing S.C. to hit her head and lose consciousness. Also, S.C.'s glasses cut her face above her eyebrow when she hit the ground.

Shortly thereafter, S.C.'s mother arrived at school and took S.C. to the emergency room for treatment. S.C. sustained a laceration, abrasion, and contusion on her left eye. According to Mother, S.C. has a resulting eye injury and nerve damage. Meanwhile, AP Irvin claims she sustained a broken kneecap in the incident.

Over a month later, on January 7, 2014, AP Irvin filed a juvenile complaint against S.C. for third-degree assault. The complaint states that S.C. "kicked her in the right knee when she admonished (S.C.) for unruly behavior" and "(AP Irvin) fractured her left knee cap" after falling "from the kick." Mother, on the other hand, claims that AP Irvin's motive in filing the juvenile action against S.C. was to insulate herself from adverse employment action, as well as criminal and civil liability, and to prevent S.C. from returning to Kerrick Elementary.

Three years later, in 2017, Mother filed suit against Principal Holmes and AP Irvin in their individual capacities, alleging negligence, negligence *per se*, assault, battery, intentional infliction of emotional distress, and abuse of process. Mother did not sue Principal Holmes and AP Irvin in their official capacities and did not name the school as a defendant.

Trial was scheduled for January 28, 2020. Shortly before trial, in October 2019, Mother and S.C. gave their depositions. Thereafter, Principal Holmes and AP Irvin moved for summary judgment, attaching affidavits regarding the incident. Subsequently, Principal Holmes and AP Irvin moved the circuit court to continue the trial date to allow the court sufficient time to decide their summary judgment motion and citing a potential conflict with the trial date. The court granted their motion.

On February 18, 2020, the circuit court granted summary judgment to Principal Holmes and AP Irvin, finding they were entitled to qualified immunity from liability, that a genuine issue of material fact did not exist to support Mother's claims, and they were protected from liability under the Paul D. Coverdell Teacher Protection Act of 2001 (TPA), 20 U.S.C.A.[4] § 7941, *et seq.* Mother filed a CR[5] 59 motion to alter, amend, or vacate, which the trial court denied. This appeal followed. Additional facts will be developed as necessary to the legal analysis.

<u>STANDARD OF REVIEW</u>

We begin by reviewing the standards to be used when handling summary judgment. "Summary judgment is to be 'cautiously applied and should not be used as a substitute for trial.'" *Shelton v. Kentucky Easter Seals Society, Inc.*, 413 S.W.3d 901, 905 (Ky. 2013) (quoting *Steelvest, Inc. v. Scansteel Service Center, Inc.*, 807 S.W.2d 476, 483 (Ky. 1991)). Granting summary judgment "is an extraordinary remedy" and should only be used to terminate litigation when, as a matter of law, it appears that it would be impossible for the respondent to produce evidence at trial warranting a judgment in her favor and against the movant. *Id.* (citations omitted). The term "impossible" is to be used in a practical sense, not in an absolute sense. *Id.* The circuit court must review the evidence to

---

[4] United States Code Annotated.

[5] Kentucky Rules of Civil Procedure.

determine whether a genuine issue of material fact exists. *Id.* This requires the facts be viewed through a lens most favorable to the party opposing summary judgment. *Id.* Here, the facts must be viewed in a light most favorable to Mother.

Appellate review of a motion for summary judgment only involves questions of law and "a determination of whether a disputed material issue of fact exists." *Shelton,* 413 S.W.3d at 905. Therefore, our review is *de novo* with no need to defer to the circuit court's decision. *Id.*

ANALYSIS

For her appeal, Mother urges this Court to reverse the summary judgment because factual discrepancies surround the December 2, 2013 incident. Also, Mother argues that qualified official immunity does not apply because the restraint of S.C. was a ministerial function. Furthermore, Mother argues that Principal Holmes and AP Irvin were negligent *per se* for violating 704 KAR[6] 7:160; evidence may support her abuse of process claim against AP Irvin and, thus, summary judgment was premature; her intentional tort claims of assault and battery[7] survive because Principal Holmes and AP Irvin intended to lift S.C. off the ground; and the TPA does not protect Principal Holmes and AP Irvin because they

---

[6] Kentucky Administrative Regulations.

[7] At oral argument, counsel for Mother conceded that she was no longer pursuing her intentional infliction of emotional distress claim.

-6-

did not comply with 704 KAR and Jefferson County Public Schools (JCPS) policies and procedures.

## I.  Qualified official immunity.

We begin with Mother's argument that Principal Holmes and AP Irvin are not entitled to qualified official immunity because they negligently performed a ministerial act when restraining S.C.  Principal Holmes and AP Irvin, on the other hand, argue they are entitled to qualified official immunity because they made a judgment call when restraining S.C., which was a discretionary act.

The application of qualified official immunity "has long been problematic[.]" *Patton v. Bickford*, 529 S.W.3d 717, 723 (Ky. 2016).  Generally, qualified official immunity is "immunity from tort liability afforded to public officers and employees for acts performed in the exercise of their discretionary functions." *Id.* (quoting *Yanero v. Davis*, 65 S.W.3d 510, 521 (Ky. 2001)).  "Qualified immunity applies only to the negligent performance of duties that are discretionary in nature." *Id.* at 723-24.  In contrast, qualified immunity is not provided for the negligent performance of a ministerial act. *Id.* at 724.  In other words, the act of governing cannot be a tort, but failing to properly carry out the government's commands, when the acts to be performed are known and certain, can be a tort. *Id.*

"Categorizing actions as either the performance of a discretionary duty or the performance of a ministerial duty is vexing to litigants and courts alike." *Id*. The distinction between discretionary and ministerial "rests not on the status or title of the officer or employee, but on the function being performed." *Id.* (citation omitted). "Indeed, most immunity issues are resolved by examining the nature of the functions with which a particular official or class of officials has been lawfully entrusted." *Id.* (citation omitted). A rudimentary distinction between discretionary and ministerial acts is: "[p]romulgation of rules is a discretionary function; enforcement of those rules is a ministerial function." *Id.* (quoting *Williams v. Kentucky Department of Education*, 113 S.W.3d 145, 150 (Ky. 2003)). While simplistic, this distinction "serves as a sound point from which to begin." *Id.*

A ministerial duty is one that "requires only obedience to the orders of others." *Id.* (quoting *Yanero*, 65 S.W.3d at 522). In other words, a duty is ministerial "when the officer's duty is absolute, certain, and imperative, involving merely execution of a specific act arising from fixed and designated facts." *Id.* "The point is that a government official performing a ministerial duty does so without particular concern for his own judgment" or, stated another way, "the act is ministerial 'if the employee has no choice but to do the act.'" *Id.* (quoting *Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014)).

In contrast, discretionary acts are "good faith judgment calls made in a legally uncertain environment" and involve "personal deliberation, decision, and judgment." *Yanero*, 65 S.W.3d at 522. The rationale for providing immunity to discretionary acts is that "courts should not be called upon to pass judgment on policy decisions made by members of coordinate branches of government in the context of tort actions, because such actions furnish an inadequate crucible for testing the merits of social, political or economic policy." *Id.* at 519.

With this understanding of the law, we turn to the issue of whether Principal Holmes' and AP Irvin's actions were ministerial or discretionary. To answer this question, we look at the facts more closely.

On the morning of December 2, 2013, S.C. was late to school. She had a scheduled appointment with her therapist, but the therapist cancelled while S.C. and Mother were in route that morning. Mother brought S.C. on to school. When they arrived, Mother took S.C. into school and signed her in. S.C. began crying and flapping her arms. When Mother left, S.C. tried to chase after her. Apparently, a school staff member "locked" S.C. in the assistant principal's office but S.C. got out and tried to leave the school. In her deposition, S.C. explained that she has separation anxiety and did not want her Mother to leave. S.C. testified that Principal Holmes and AP Irvin grabbed her arms, then grabbed her feet, which led to her being "slammed" to the floor. S.C. claimed she was "knocked out."

When she awoke, Ms. Lauri Wade, the school staff member with whom she had a close relationship, was trying to place an ice pack on her head. S.C. denied kicking AP Irvin. She further testified that Principal Holmes and AP Irvin should not have touched her, as she would have calmed herself down and she never intended to leave the school building.

In Mother's deposition, she testified that S.C. attended Kerrick Elementary from Kindergarten through fifth grade. Mother admitted that S.C. had a history of walking out of class and screaming, and S.C. had a BIP to address her behavior. In addition to the BIP, Mother testified that Ms. Wade used point cards, break times, and a "bounce ball" that S.C. could sit on and roll to help with her behavior. Mother only recalled a safe crisis management (SCM) being used on S.C. one time, which was when S.C. was having a bad day and walked out of class. Mother did not describe that SCM in detail but testified that Ms. Wade used it properly. Mother further testified that she is trained in SCM and lifting a child off the ground is contrary to that training.

In its ruling, the circuit court held that Mother had "not established a black and white rule that educators at the School were required to minister when a child attempts to flee" and that S.C. "forced Defendants to react by creating an action plan out of whole cloth." Thus, the circuit court concluded that Defendants' actions were discretionary. While acknowledging that "some rules and protocols

regarding student supervision and to protect (S.C.) existed," the circuit court held that Defendants had "considerable leeway in how they conducted their physical interactions with (S.C.)."

While Principal Holmes and AP Irvin did not testify that they had a specific duty to supervise or control S.C., we know they undertook that duty when S.C. attempted to run from the school. In their affidavits, they acknowledge that S.C. had a BIP to address her behavior, including her history of trying to run from school. They understood methods in the BIP, such as speaking to S.C. in a soothing manner, before they decided to restrain her to prevent her from running from the school.

Administrative regulation, 704 KAR 7:160, outlines when physical restraint may be used on a student in a public school. Under this regulation, physical restraint may only be used if "[t]he student's behavior poses an imminent danger of physical harm to self or others[.]" 704 KAR 7:160 § 3(3)(a). Moreover, physical restraint may only be used if "less restrictive behavioral interventions have been ineffective in stopping the imminent danger of physical harm to self or others, except in the case of a clearly unavoidable emergency situation posing imminent danger of physical harm to self or others." 704 KAR 7:160 § 3(3)(d). Finally, physical restraint may only be used if the school personnel implementing the restraint is "appropriately trained as required by Section 6(3) of the regulation,

except to the extent necessary to prevent physical harm to self or others in clearly unavoidable emergency circumstances where other school personnel intervene and summon trained school personnel as soon as possible." 704 KAR 7:160 § 3(3)(e).

Here, according to Principal Holmes' affidavit, she used physical restraint to keep S.C. from endangering herself. *See* 704 KAR 7:160 § 3(3)(a). Also, as stated, Principal Holmes and AP Irvin used "less restrictive behavioral interactions," such as speaking to S.C. in a soothing voice and calling a staff member with whom S.C. had a close, positive relationship before using physical restraint. *See* 704 KAR 7:160 § 3(3)(d). Even if Principal Holmes and AP Irvin were not "appropriately trained" to use physical restraint, they were allowed to restrain students in "clearly unavoidable emergency circumstances" to prevent physical harm to self or others. 704 KAR 7:160 § 3(3)(e). Principal Holmes and AP Irvin viewed S.C. running from school as an "unavoidable emergency circumstance" and even Mother agreed that S.C. should not be allowed to run out of school:

> Q:     Did you have any discussions with Kerrick staff about whether or not to allow (S.C.) to run out of the school?
> A:     Did I have any discussion with them not to let her run out of school?
>
> Q:     Uh-huh.
>
> A:     You know, (S.C.'s) not supposed to run out of school.

Brenda Cook 10/16/19 depo., p. 20.

We conclude that Principal Holmes' and AP Irvin's restraint of S.C. was a matter of their discretionary decision-making. They had to evaluate and exercise discretion in determining how to do that job in the scenario they faced. "The very purpose of the doctrine of qualified official immunity is to protect government officials exercising discretion from second-guessing of their good faith decisions made in difficult situations such as this." *Turner v. Nelson*, 342 S.W.3d 866, 878 (Ky. 2011). This situation typifies a "legally uncertain environment." *Yanero*, 65 S.W.3d at 522 ("[Q]ualified official immunity . . . affords protection from damages liability for good faith judgment calls made in a legally uncertain environment."). While school principals have a "duty to provide a safe school environment," "they are not insurers of children's safety." *Marson*, 438 S.W.3d at 299. Their duty to look out for a child's safety is a discretionary function because it is "so situation specific, and because it requires judgment rather than a fixed, routine performance[.]" *Id.* Therefore, we conclude that Principal Holmes and AP Irvin are entitled to qualified official immunity.

This is not to say that the Court is not sympathetic to students like S.C. Students with special needs, like S.C., should receive protections from punishment for behavior that is a manifestation of their disabilities. *See* 20

-13-

U.S.C.A. § 1415.[8]  As S.C. testified, she has separation anxiety, which made her want to run from school and back to her Mother.  However, the school staff also has a duty to keep S.C. safe.  Running from the school building creates an emergency situation and could pose an imminent danger to S.C., which the school staff tried to prevent by physically restraining S.C.  The school staff's actions were discretionary.

## II.    Negligence *per se*.

Next, Mother argues that Principal Holmes and AP Irvin were negligent *per se* because they violated KRS 156.160(1)[9] and KRS 158.444(1),[10] as well as 704 KAR 7:160, when they secluded, physically restrained, and injured S.C.  Mother claims that genuine issues of material fact exist regarding whether an imminent danger necessitated the use of force against S.C.

Qualified official immunity applies to negligence *per se* claims.  *See Nelson*, 342 S.W.3d at 874 (holding qualified official immunity applies whether the cause of action is common law or statutory).  However, we do not need to

---

[8] Mother did not allege any claims under the Individuals with Disabilities Education Act in this case.

[9] KRS 156.160(1) provides that the Kentucky Board of Education shall promulgate administrative regulations establishing standards for school districts to meet in student, program, service, and operational performance.

[10] KRS 158.444(1) provides that the Kentucky Board of Education shall promulgate appropriate administrative regulations relating to school safety, student discipline, and related matters.

address whether qualified official immunity applies to this claim because Mother failed to adequately allege sufficient facts to support her claim that Principal Holmes and AP Irvin were negligent *per se.* While 704 KAR 7:160 addresses the seclusion and restraint of students, Mother does not allege how this regulation was violated. Therefore, we conclude that summary judgment was properly granted as to Mother's negligence *per se* claim.

## III. Abuse of process.

Mother claims that AP Irvin committed the tort of abuse of process by filing a juvenile criminal complaint against S.C. because AP Irvin wanted to insulate herself from adverse employment action, as well as potential criminal and civil liability. In response, AP Irvin claims she is entitled to qualified immunity for this tort. If not immune, AP Irvin claims that Mother cannot meet the elements for the tort of abuse of process because Mother cannot prove that she filed the juvenile criminal complaint to extort or coerce Mother or S.C. directly.

We first address whether AP Irvin is entitled to qualified official immunity for the tort of abuse of process. An action for abuse of process is "the irregular or wrongful employment of a judicial proceeding[.]" *Stoll Oil Refining Co. v. Pierce*, 337 S.W.2d 263, 266 (Ky. 1960). The essential elements for abuse of process are: "(1) an ulterior purpose and (2) a willful act in the use of the

process not proper in the regular conduct of the proceeding." *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky. 1998) (citations omitted).

Here, AP Irvin's affidavit states that she filed the juvenile complaint against S.C. for her broken kneecap. AP Irvin does not attest that filing the complaint was a requirement of her job or that she was acting within the scope of her employment as an assistant principal when she filed the juvenile complaint against S.C. Thus, we conclude that AP Irvin is not entitled to qualified official immunity for the tort of abuse of process because filing the juvenile complaint was not performed in the exercise of her discretionary function. Accordingly, we turn to whether Mother could satisfy the elements for the tort of abuse of process.

In *Simpson v. Laytart*, *supra*, the Kentucky Supreme Court held that abuse of process "usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property on the payment of money, by the use of the process as a threat or a club." *Id.* at 395 (quoting W. Prosser, *Handbook of the Law of Torts*, Section 121 (4th ed. 1971)). In other words, "what is done in the course of negotiation, rather than the issuance or any formal use of the process itself" constitutes the tort. *Id.*

For instance, in *Mullins v. Richards*, 705 S.W.2d 951, 952 (Ky. App. 1986), defendants had their cars repaired by plaintiff, an automobile repair shop owner, but were dissatisfied with the work and refused to pay. Defendants asked a

grand jury to indict plaintiff with theft by deception, which it did. In response, plaintiff filed suit against defendants for abuse of process. The trial court dismissed plaintiff's suit because he failed to show defendants used the indictments against him outside the criminal proceeding and, on appeal, we affirmed, focusing on the lack of contact between defendants and plaintiff after the indictment. *Id.* The Court held that plaintiff failed to state a cause of action for abuse of process because defendants had not offered to drop the indictments in return for a release of their debts to plaintiff. *Id.*

Here, the incident occurred on December 2, 2013, and AP Irvin filed the juvenile complaint against S.C. over a month later, on January 7, 2014. In the juvenile complaint, AP Irvin claimed that S.C. kicked her in the right knee and "due to her falling from the kick," she fractured her left kneecap. The juvenile complaint charges S.C. with third-degree assault in violation of KRS 508.025.[11] According to AP Irvin's affidavit, she "agreed to participate in Restorative Justice so (S.C.) could avoid court" but Mother and S.C. would not agree. Other than receiving a KRS 610.345 notice in May 2014, AP Irvin attests that she had no contact with Mother and S.C. regarding the juvenile proceeding.

---

[11] KRS 508.025(1)(a)9., in effect in 2014, states that "[a] person is guilty of assault in the third degree when the actor: (a) [r]ecklessly, with a deadly weapon or dangerous instrument, or intentionally causes or attempts to cause physical injury to: 9. [a] public or private elementary or secondary school or school district classified or certified employee . . . acting in the course and scope of the employee's employment[.]" At the time, violation of this statute was considered a Class D felony. KRS 508.025(2).

Because juvenile proceedings are confidential, the Court does not know if the January 2014 juvenile complaint was dismissed or if any further action was taken against S.C. as a result of the assault charge. Regardless, the Court is troubled by AP Irvin's decision to file a juvenile criminal complaint against S.C. for this incident. Bringing the potential weight of the criminal justice system down on a ten-year old child seems excessive. Nevertheless, Mother's allegations that AP Irvin was motivated to file the juvenile complaint against her daughter to prevent S.C. from returning to Kerrick Elementary and insulate herself from liability are not enough to survive summary judgment for an abuse of process claim. Even if this was sufficient motive to establish an ulterior purpose element, Mother's abuse of process claim still fails because, as in *Mullins v. Richards*, *supra*, Mother cannot prove that AP Irvin used the juvenile complaint as leverage to prevent S.C. from returning to Kerrick Elementary. Because Mother cannot prove the elements necessary for the tort of abuse of process, we conclude that summary judgment was properly granted on this claim.

## IV. Assault and battery.

Mother argues the circuit court should not have granted summary judgment on her intentional tort claims of assault and battery because she only needed to show that Principal Holmes and AP Irvin intended to make physical contact with S.C., not that they intended to harm S.C. And, when they lifted S.C.

off the ground, this was an unlawful touching of S.C.'s body and resulted in her ultimate fall and injuries.

In response, Principal Holmes and AP Irvin argue they are immune from liability for these intentional torts. If not, they argue Mother cannot prove assault and battery because Principal Holmes and AP Irvin put their hands on S.C. only to attempt to control her behavior, not to harm her.

Assault is "an attempt or effort, with force and violence, to do a corporal hurt to another by striking at another in striking distance with or without a weapon, though the party striking misses his aim." *Sigler v. Ralph*, 417 S.W.2d 239, 241 (Ky. 1967). Battery is "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him." *Id.* Moreover, battery is "an intentional tort; it is not committed by a negligent act." *Vitale v. Henchey*, 24 S.W.3d 651, 656 (Ky. 2000) (citation omitted).

Qualified official immunity is available only to officials acting in good faith. *Martin v. O'Daniel*, 507 S.W.3d 1, 4-6 (Ky. 2016). Acting with malice and acting in good faith are mutually exclusive. *Id.* Mother had the burden to show Principal Holmes and AP Irvin were not acting in good faith. *Ritchie v. Turner*, 559 S.W.3d 822, 844 (Ky. 2018) (citing *Yanero*, 65 S.W.3d at 523)). While S.C. was indisputably harmed in the incident, Mother has not proven the intent necessary to satisfy the elements of these intentional tort claims. She has no

testimony that either Principal Holmes or AP Irvin intended to harm S.C. in the incident. Indeed, Principal Holmes and AP Irvin testified, through their affidavits, that they were trying to keep S.C. safe from harm by physically restraining her. Because Mother fails to show that Principal Holmes and AP Irvin intended to harm S.C., we conclude that summary judgment was properly granted on this claim.

**V.     Paul D. Coverdell Teacher Protection Act ("TPA").**

Finally, in its order, the circuit court concluded that the TPA *mandated* judgment for Principal Holmes and AP Irvin because they "made a showing that their efforts were focused on protecting (S.C.) from harm to herself as she attempted to flee the school" and the TPA provides liability protection for teachers "in precisely this type of scenario." The Court has already affirmed summary judgment in favor of Principal Holmes and AP Irvin on all claims. However, we want to clarify that the TPA does not *mandate* judgment in favor of teachers.

The TPA was enacted in 2001 for the stated purpose of providing "teachers, principals, and other school professionals the tools they need to undertake reasonable actions to maintain order, discipline, and an appropriate educational environment." 20 U.S.C.A. § 7942. In part, 20 U.S.C.A. § 7946(a) states:

-20-

[N]o teacher in a school shall be liable for harm caused by an act or omission of the teacher on behalf of the school if—

> (1) the teacher was acting within the scope of the teacher's employment or responsibilities to a school or governmental entity;

> (2) the actions of the teacher were carried out in conformity with Federal, State, and local laws (including rules and regulations) in furtherance of efforts to control, discipline, expel, or suspend a student or maintain order or control in the classroom or school;

> (3) if appropriate or required, the teacher was properly licensed, certified, or authorized by the appropriate authorities for the activities or practice involved in the State in which the harm occurred, where the activities were or practice was undertaken within the scope of the teacher's responsibilities;

> (4) the harm was not caused by willful or criminal misconduct, gross negligence, reckless misconduct, or a conscious, flagrant indifference to the rights or safety of the individual harmed by the teacher[.]

Further, the TPA provides that its immunity provisions preempt any inconsistent state law except where a state law "provides additional protection from liability relating to teachers."  20 U.S.C.A. § 7945(a).

The TPA does not provide teachers immunity from suit like qualified official immunity.  Instead, the TPA can provide an exemption from liability.  20 U.S.C. § 7946(a) (stating "no teacher in a school shall be liable for harm caused by

an act or omission of the teacher on behalf of the school if" and then setting forth the requirements for it to apply). The TPA only provides limited protection if the teacher's actions were carried out in conformity with the rules and regulations. Because the circuit court made no finding that Principal Holmes and AP Irvin's actions were carried out in conformity with the rules and regulations, we conclude that the circuit court's reliance on the TPA for summary judgment was misplaced.

## CONCLUSION

For the foregoing reasons, we affirm the circuit court's order.

GOODWINE, JUDGE, CONCURS.

KRAMER, JUDGE, DISSENTS AND DOES NOT FILE A SEPARATE OPINION.

BRIEF AND ORAL ARGUMENT
FOR APPELLANT:

Peter J. Jannace
Louisville, Kentucky

BRIEF FOR APPELLEES:

Mark S. Fenzel
Dana L. Collins
Katherine T. Reisz
Louisville, Kentucky

ORAL ARGUMENT FOR
APPELLEES:

Kevin L. Chlarson
Louisville, Kentucky